**2017 UT App 124**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
ROBBIE MICHAEL MACDONALD,
Appellee.

Opinion
No. 20150123-CA
Filed July 28, 2017

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 131400351

Sean D. Reyes, Ryan D. Tenney, and Jeffrey S. Gray,
Attorneys for Appellant

Margaret P. Lindsay and Matthew R. Morrise,
Attorneys for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

VOROS, Judge:

¶1     Robbie Michael MacDonald was charged with child
abuse, a second degree felony, and obstructing justice, a third
degree felony. This court granted the State's petition for
interlocutory appeal from two pretrial suppression rulings. We
affirm in part and reverse in part.

### BACKGROUND

¶2     In reviewing a district court's ruling on a suppression
motion, we view the facts in the light most favorable to the
district court's findings and recite them accordingly. *See State v.*

*Mitchell*, 2013 UT App 289, ¶ 2, 318 P.3d 238. However, because this case comes to us on appeal from an interlocutory order, MacDonald remains presumed innocent of the charged offense.

## The Injury

¶3    MacDonald lived with his girlfriend (Mother), Mother's ten-month-old baby (Child), and another child. During the approximately six-week period that the couple lived together, MacDonald "yelled constantly and excessively." MacDonald called Child a "whiner" and directed racial slurs at him. MacDonald did not like Child clinging to Mother, encouraged her to leave Child alone when Child cried, pulled Child away from her, and encouraged Mother to give Child to Child's father for parent time. Mother became suspicious that MacDonald was jealous of Child.

¶4    While living with MacDonald, Mother noticed three interactions that caused her concern. First, in early December, on more than one occasion MacDonald picked Child up by the arms, carried him across the room, and dropped him on a bean bag chair. Child cried after MacDonald did this. Second, in early January, Child became sick. Mother asked MacDonald to give Child medicine. After he administered the medicine, she observed bruises on both of Child's cheeks. When Mother asked MacDonald about the bruising, he told her that Child fell on a toy. Third, on January 13, 2013, MacDonald "flipped off" Child with both hands.

¶5    On January 18, 2013, MacDonald stayed home to watch Child while Mother went to work. Later that afternoon, MacDonald called Mother to tell her that Child had stopped breathing and he had called an ambulance. At the hospital, doctors diagnosed Child with a head contusion, pulmonary edema, a subdural hematoma, massive retinal hemorrhaging,

and Abusive Head Trauma resulting in irreversible brain damage, blindness, and seizures.[1]

*The First Interview*

¶6    After paramedics transported Child to the hospital, police officers asked MacDonald to come to the police station to explain the events preceding Child's injuries. The officers video-recorded the interview. At the outset of the interview, an officer read MacDonald his *Miranda* rights, but stated that he was "not sure if you . . . particularly need your rights," because he was "just . . . asking what's going on" with Child. The officer asked MacDonald if he understood his rights. MacDonald responded affirmatively by nodding his head. The interview room door was closed but not locked; the officer did not restrain MacDonald or tell him that he was under arrest; and the interviewing officer was the only person in the room with MacDonald. MacDonald was left alone in the interview room for approximately 40 minutes during the interview. The officer wore plain clothes and was unarmed.

¶7    MacDonald said that Child fell asleep on the living room floor so he picked Child up and laid him down in his crib. He explained that when he later checked on Child, he found him unresponsive and not breathing, with vomit on his mouth. He stated that when he found Child, he yelled for his roommate to help and the roommate called 911. After the interview, an officer drove MacDonald home.

---

1. Abusive Head Trauma is defined as "an injury to the skull or intracranial contents of an infant or young child (<5 years of age) due to inflicted blunt impact and/or violent shaking." Sharyn E. Parks, et al., Centers for Disease Control and Prevention, *Pediatric Abusive Head Trauma: Recommended Definitions for Public Health Surveillance and Research* 10 (2012).

*The Second Interview*

¶8    A police investigator later called MacDonald and asked him to come to the police station for a second interview. Police officers again video-recorded the interview. The interview room door was closed but not locked. Two officers interviewed MacDonald; both wore plain clothes and were unarmed. They did not restrain MacDonald or tell him that he was under arrest.

¶9    During the interview, MacDonald repeated the same version of events that he described in his first interview—that after Child fell asleep on the floor, MacDonald put him down in his crib and later found Child unresponsive and not breathing, with vomit on his mouth. One of the officers then told MacDonald that medical tests showed that Child had "suffered trauma" and suggested that "something else happened." The officer told MacDonald that he did not "have any intentions of running [him] down to jail . . . tonight," but urged MacDonald to "take the high road" and "come clean" with what happened to Child. MacDonald then told the officers that when he walked into the room to lay Child in his crib, he tripped on the rug and dropped Child on the floor. After further questioning about Child's injuries, the officers left MacDonald alone in the interview room for approximately one hour. At the conclusion of the interview, MacDonald provided a signed, written statement. After the interview, MacDonald's grandfather drove him home.

*The Third Interview*

¶10    A police investigator called MacDonald a day later and asked him to come to the police station for a third interview. Police officers video-recorded the interview. The interview room door was again closed but not locked; the interviewing officer did not restrain MacDonald or tell him that he was under arrest; and the officer was the only person in the room with MacDonald. The officer wore plain clothes and was unarmed.

¶11 At the beginning of the interview, the officer read MacDonald his *Miranda* rights and asked him if he understood the rights. MacDonald responded, "Yes." The officer asked if MacDonald was still willing to talk to police, and MacDonald responded affirmatively. MacDonald repeated the version of events that he described in his second interview—that when he walked into the room to lay Child in his crib, he tripped on the rug and dropped Child on the floor. After the interview, police drove MacDonald home.

*Court Proceedings*

¶12 The State charged MacDonald with one count of child abuse with serious bodily injury and one count of false written statements.[2] MacDonald moved to suppress his second and third interviews. At argument on the motion, the district court questioned whether the first interview should also be suppressed given the lack of an express *Miranda* waiver. The district court ultimately suppressed MacDonald's written statement and his statements from the first and second interviews, but not the third.

¶13 With respect to the first interview, the court ruled (1) that MacDonald was in custody for *Miranda* purposes, and (2) that the police interrogator was thus required to—but did not—ask MacDonald if he waived his *Miranda* rights. With respect to the second interview, the court ruled (1) that MacDonald was in custody for *Miranda* purposes, (2) that the police interrogator did not read MacDonald his *Miranda* rights, and (3) that the police interrogator did not obtain from MacDonald a waiver of his rights. And the district court suppressed the written statement based on its finding that MacDonald did not receive or waive his *Miranda* rights during the second interview.

_____

2. The State later amended the information to replace the charge of false written statements with obstruction of justice.

¶14    The State moved under rule 404(b) of the Utah Rules of Evidence to admit evidence of MacDonald's interactions with Child. The court admitted evidence that MacDonald had directed racial slurs toward Child in the weeks before his injuries occurred. But the court excluded evidence that MacDonald (1) yelled frequently at Child, (2) called him a "whiner," (3) "flipped off" Child, (4) was jealous of the attention Mother paid to Child, (5) previously bruised Child's cheeks when he administered medication, and (6) previously picked Child up by the arms in a rough manner, carried him across the room, and dropped him on a bean bag chair.

¶15    The State appeals the suppression of the first and second interviews and the exclusion of the rule 404(b) evidence. We granted interlocutory review.

ISSUES AND STANDARDS OF REVIEW

¶16    The State contends that the district court erred in suppressing the first and second interviews for two reasons. First, the State argues that the district court erred in concluding that MacDonald was in custody for *Miranda* purposes during the first and second interviews. In the alternative, the State argues that, even if MacDonald was in custody during the interviews, the court erred in concluding that MacDonald did not waive his rights.

¶17    "A district court's ruling on a motion to suppress is reviewed for correctness, including its application of the law to the facts." *State v. Perea*, 2013 UT 68, ¶ 32, 322 P.3d 624 (citation and internal quotation marks omitted). "We review the district court's factual findings for clear error." *Id.* We will conclude that clear error occurred only if, resolving all disputes in the evidence in a light most favorable to the court's determination, the court's factual findings are not adequately supported by the record. *Id.* "Whether an interrogation is custodial is a mixed question of fact

and law, which we review nondeferentially for correctness." *State v. Tingey*, 2016 UT App 37, ¶ 7, 368 P.3d 467 (citing *State v. Levin*, 2006 UT 50, ¶¶ 42, 44, 46, 144 P.3d 1096).

¶18 The State also contends that the district court exceeded its discretion in ruling that the State's proffered evidence was inadmissible under rule 404(b) of the Utah Rules of Evidence. We review a district court's decision to exclude evidence under rule 404(b) under an abuse-of-discretion standard. *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016.

ANALYSIS

I. The Interviews

¶19 The State contends that the district court erred in ruling that MacDonald was in custody and thus entitled to *Miranda* warnings. In the alternative, the State contends that even if MacDonald was in custody, the interrogating officers duly advised him of his *Miranda* rights, and MacDonald duly waived them. Because we determine that MacDonald was not in custody for *Miranda* purposes, we do not reach the State's alternative contention.

¶20 The Fifth Amendment to the United States Constitution guarantees that a person shall not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend V. "We protect this right by excluding from a defendant's criminal trial any incriminating statement that the defendant made to police officers while under custodial interrogation if the officers did not give a *Miranda* warning." *State v. Levin*, 2006 UT 50, ¶ 33, 144 P.3d 1096 (citing *Rhode Island v. Innis*, 446 U.S. 291, 297, 300–01 (1980); *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966)). By "'custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody

or otherwise deprived of his freedom of action in any significant way.'" *California v. Beheler*, 463 U.S. 1121, 1123 (1983) (per curiam) (quoting *Miranda*, 384 U.S. at 444); *accord Levin*, 2006 UT 50, ¶ 35.

¶21   *Custody* is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). To determine whether someone is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (brackets, citation, and internal quotation marks omitted). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

¶22   In addressing this initial step of the inquiry, "courts must examine all of the circumstances surrounding the interrogation." *Howes*, 565 U.S. at 509 (citation and internal quotation marks omitted). Factors that have been found relevant to this inquiry include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (citations omitted). The location or site of the questioning "is more likely to indicate that the suspect was in custody when the location is confined or isolated, or is intimidating or coercive." *State v. Fuller*, 2014 UT 29, ¶ 45, 332 P.3d 937 (citations and internal quotation marks omitted). Also, the fact that "the interrogation took place in a police car"—or, as here, in a police station—"is not dispositive of the custody issue and must be weighed against the defendant's voluntary choice to enter the car" or station house. *See id.* In

examining the "objective indicia of arrest, we look to whether handcuffs, drawn guns, locked doors, threats, or coercion are present." *Id.* (citation and internal quotation marks omitted). And in examining the officers' questioning, we "ask if the form of the interrogation evidenced a clear coercive intent on the part of the officer." *Id.* (citation and internal quotation marks omitted).

¶23　Another relevant factor concerns whether the questioning focused on the accused. *Id.* ¶ 44. However, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury v. California*, 511 U.S. 318, 324 (1994) (per curiam); *see also Levin*, 2006 UT 50, ¶ 35 ("[W]e focus . . . on objective evidence of the officers' intentions."); *State v. Heywood*, 2015 UT App 191, ¶ 50 n.4, 357 P.3d 565. And even when police disclose that they suspect the interviewee of a crime, that disclosure may not bear great weight in the custody analysis where other objective indicia of arrest are absent. For example, in *Mathiason*, police disclosed to Mathiason that they suspected him of committing a burglary and falsely informed him that his fingerprints were found at the scene of the crime. *Mathiason*, 429 U.S. at 495. But in light of the totality of the circumstances present, the Supreme Court determined that Mathiason was not in custody. *See id.* at 495–96. In sum, the Supreme Court has "explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Beheler*, 463 U.S. at 1125 (citation and internal quotation marks omitted).

¶24　But determining whether a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave is only the first step in the custody analysis. "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes*, 565 U.S. at 509. Even if the subject would not have felt free to leave, we must still question

"whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* For example, a driver is not free to leave during a traffic stop, *Delaware v. Prouse*, 440 U.S. 648, 663 (1979), nor a pedestrian during a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 30–31 (1968). But these "temporary and relatively nonthreatening" detentions "do[] not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010); *see also Berkemer v. McCarty*, 468 U.S. 420, 436–40 (1984). The Supreme Court has contrasted such detentions with stationhouse interrogation, "which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek," and in which the subject "feels completely at the mercy of the police." *Berkemer*, 468 U.S. at 438.

¶25　In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court decided the appeals of four defendants, each raising the same issue but on slightly different facts regarding custody. Miranda was arrested in his home, taken to the police station, and interviewed for two hours without being advised of his Fifth Amendment rights. *Id.* at 491–92. Vignera was picked up by police, transported to two different police stations, questioned, formally arrested, transported to a third police station, and questioned again without being advised of his Fifth Amendment rights. *Id.* at 493–94. Westover was arrested by police, placed in a police line-up, booked, and interviewed without being advised of his Fifth Amendment rights. *Id.* at 494–95. Stewart was arrested in his home; police then searched his home, arrested his wife and three visitors to his home, jailed him, and interrogated him nine times over the course of five days without advising him of his rights. *Id.* at 497. In each instance, the Supreme Court concluded that "statements were obtained from the defendant under circumstances that did not meet constitutional standards for protection of the privilege" against self-incrimination—which gave rise to the common phrase "*Miranda* rights." *Id.* at

491. All four interrogations, the Court noted, "share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." *Id.* at 445.

¶26    Later Supreme Court cases illustrate circumstances where defendants, though questioned by police, were not in custody for purposes of receiving their *Miranda* rights. For example, in *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam), Mathiason voluntarily agreed to go to the police station after police initiated contact with him. *Id.* at 493. Police officers informed Mathiason that he was a suspect in a burglary, falsely informed him that his fingerprints were found at the scene of the crime, and conducted a 30-minute interview. *Id.* at 493, 495. Mathiason admitted to participating in the burglary. *Id.* at 493. Police officers then advised him of his *Miranda* rights. *Id.* at 494. Mathiason left the police station after the interview. *Id.* The Supreme Court held that Mathiason was not in custody for *Miranda* purposes, concluding that such "a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Id.* at 495 (emphasis added).

¶27    In *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam), Beheler reported a murder to police and voluntarily agreed to accompany them to the police station, where the interview took place. *Id.* at 1122. Police officers had already identified Beheler as a suspect in the murder, but told him he was not under arrest. *Id.* at 1123. Beheler was interviewed shortly after the crime was committed, while he was "emotionally distraught," and he had consumed alcohol earlier in the day. *Id.* at 1124–25. The Supreme Court held that *Miranda* warnings were not required where "the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview." *Id.* at 1121.

¶28 Here, in light of the foregoing precedents, we cannot conclude that the first and second interviews presented "such a restriction on [MacDonald's] freedom as to render him 'in custody.'" *See Mathiason*, 429 U.S. at 495. Accordingly, *Miranda* warnings were not required.

A. The First Interview

¶29 MacDonald initiated contact with authorities by having his roommate call 911 when he found Child unresponsive. He later voluntarily accompanied police officers to the police station for questioning. The duration of the questioning was less than half an hour. Although the interview lasted about an hour, MacDonald was left alone for 40 minutes of that time. The duration of the interview was thus comparable to that in *Beheler* and *Mathiason*. *See Beheler*, 463 U.S. at 1122 ("The interview lasted less than 30 minutes."); *Mathiason*, 429 U.S. at 495 ("[a]t the close of a ½-hour interview . . ."). The officers also assured MacDonald that he would be allowed to leave after the interview. Physical restraints were absent during the interview, the officers wore plain clothes and displayed no visible weapons, and the interview room door was closed but not locked. *See State v. Reigelsperger*, 2017 UT App 101, ¶ 58 (concluding that circumstances of an interview suggesting the defendant was not in *Miranda* custody included a lack of physical restraints and detectives that were unarmed, not in full uniform, and carried only a pair of handcuffs). Finally, the police officers allowed MacDonald to leave after questioning.[3]

---

3. MacDonald argues that because "the State's argument . . . includes a number of facts that were not found by the trial court, and the State relies on these facts," the State "essentially asks this Court to find the facts on appeal from the transcript of the evidentiary hearing, rather than granting any deference to the trial court's findings of fact." Specifically, MacDonald takes

(continued…)

¶30 Under step one of the *Miranda* analysis, we conclude that the circumstances surrounding MacDonald's interview are akin to those of the interviews in *Beheler* and *Mathiason*, where the defendants came to the station voluntarily, were not placed under arrest, and left the station after the interviews. *See Beheler*, 463 U.S. at 1123–24; *Mathiason*, 429 U.S. at 495. Nor did the interview feature the criteria highlighted in *Berkemer*: the questioning was not prolonged, and the setting did not suggest either that questioning would continue until MacDonald provided his interrogators the answers they sought—indeed he did not provide those answers—or that he was completely at the

---

(…continued)

issue with the State's reliance on the following facts: (1) "MacDonald was never restrained or placed in handcuffs"; (2) "the detectives were unarmed and in plain clothes"; (3) "MacDonald was never deprived of food or water"; and (4) "MacDonald had his cell phone with him during the second interview." We conducted an independent review of the entire record, including all three video-recorded interviews. *See State v. Streeter*, 900 P.2d 1097, 1101–02 (Utah Ct. App. 1995) (explaining that to determine the voluntariness of a defendant's statements, we may "conduct an independent review of the entire record"). The recordings show that MacDonald was never restrained and that the officers wore plain clothes and displayed no visible weapons. The recordings also make clear that during the first interview MacDonald had a water bottle with him, and during the second interview he was given a bottle of water and had his cell phone with him. Further, MacDonald conceded in his motion to suppress that he "was not restrained in handcuffs or told he was under arrest," and he reiterated that at the hearing on his motion. Therefore, our independent review of the record satisfies us that although the district court did not include these facts in its findings, they were established during MacDonald's pretrial proceedings.

mercy of the police officers, *see Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). We conclude that, as in *Beheler*, *Miranda* warnings were not required because "the suspect [was] not placed under arrest, voluntarily [came] to the police station, and [was] allowed to leave unhindered by police after a brief interview." *See Beheler*, 463 U.S. at 1121.

¶31   In light of the objective circumstances of the interrogation, we cannot say that MacDonald was subject to formal arrest or restraint on freedom of movement to the degree associated with a formal arrest. *See id.* at 1125.

¶32   The district court found that the interview was "accusatory in nature." Of course, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. But "even if a person is a suspect and accusatory questioning takes place in a police station, the person is not necessarily 'in custody' if there is no arrest or restriction on his freedom of movement and the interrogated person is free to terminate the interview and leave." *State v. Mirquet*, 914 P.2d 1144, 1148 (Utah 1996) (citing *Mathiason*, 429 U.S. at 495). MacDonald did not attempt to terminate the interview, and he was free to leave at its conclusion. MacDonald's questioning bore few if any of the features of the "atmosphere of domination" projecting the "invincibility of the forces of the law" described in *Miranda* and summarized above. *See Miranda v. Arizona*, 384 U.S. 436, 451 (1966).

¶33   MacDonald argues that we should consider in our analysis the district court's finding that "MacDonald was the focus of the investigation." First, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury v.*

*California*, 511 U.S. 318, 324 (1994) (per curiam); *see also State v. Levin*, 2006 UT 50, ¶ 35, 144 P.3d 1096 ("[W]e focus on . . . objective evidence of the officers' intentions."); *State v. Heywood*, 2015 UT App 191, ¶ 50 n.4, 357 P.3d 565. Here, of course, MacDonald cannot have been unaware that he was the focus of the inquiry. As the sole caregiver at the moment Child suffered injuries consistent with having been shaken, MacDonald immediately attracted official scrutiny. But "the form of the interrogation" did not evidence "a clear coercive intent on the part of the officer." *See State v. Fuller*, 2014 UT 29, ¶ 45, 332 P.3d 937 (citation and internal quotation marks omitted). Furthermore, in *Mathiason* police officers disclosed to Mathiason that they suspected him of committing a burglary and falsely informed him that his fingerprints were found at the scene of the crime. 429 U.S. at 493. Nevertheless, the Supreme Court concluded that Mathiason was not in custody. *See id.* at 495.

¶34    In sum, we conclude that in the first interview MacDonald was not in custody for purposes of *Miranda*. Accordingly, we reverse the district court's order suppressing this evidence.

B.    The Second Interview

¶35    The location of the second interview, like the first, was the police station. MacDonald went there voluntarily at an officer's request. The duration of the questioning itself was approximately one hour and 50 minutes. (Although the interview lasted two hours and 50 minutes, MacDonald was left alone for approximately one hour of that time.) As in the first interview, the officers assured MacDonald that he would be allowed to leave after the interview (as he did after the first interview), physical restraints were absent, the officers wore plain clothes and displayed no visible weapons, the interview room door was closed but not locked, and the officers allowed MacDonald to leave at the end of the questioning. The

questioning was somewhat more accusatory than in the first interview, with the officers disclosing new information that suggested that MacDonald had lied in the first interview. But the questioning, though at times pointed, was calm, respectful, and not sufficiently coercive to render the interview custodial.

¶36    We agree with the district court that a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *See Howes v. Fields*, 565 U.S. 499, 509 (2012) (alteration in original) (citation and internal quotation marks omitted). But Supreme Court precedent makes clear that more is required. And we do not agree that MacDonald was subject to "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495). The environment of MacDonald's second interview did not present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Howes*, 565 U.S. at 509. The interview was not prolonged, did not create the impression that MacDonald would be held until he had provided the answers the police wanted, and did not occur in an environment suggesting that he was completely at the mercy of the police officers. *See Berkemer v. McCarty*, 468 U.S. 420, 438 (1984).

¶37    Accordingly, we hold that the district court erred when it determined that MacDonald was in custody and entitled to receive his *Miranda* rights. And because MacDonald was not in custody and therefore was not entitled to receive his *Miranda* rights, we hold that the district court also erred in suppressing MacDonald's written statement. Accordingly, we reverse the district court's order suppressing this evidence as well.

## II. Rule 404(b) Evidence

¶38    The State contends that the district court exceeded its discretion by excluding evidence that MacDonald yelled at both

children, called Child a "whiner," harbored jealousy toward Child, "flipped off" Child, previously bruised Child's cheeks, and dropped him onto a bean bag chair. We reverse the district court's decision to exclude the evidence that MacDonald bruised Child's cheeks and dropped him onto a bean bag chair. We affirm the district court's decision to exclude the other evidence.

¶39    "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). This evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). Even then, under rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* R. 403.

¶40    The possibility that evidence of other acts may sustain an improper inference as well as a proper one is "not enough to dictate the exclusion of this evidence under rule 404(b). The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper. If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)." *State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (emphasis omitted). An ostensibly proper purpose may be rejected as a pretext or "ruse," such as where evidence that shows bad character is offered to prove an uncontested issue. *Id.* ¶ 59 (quoting *State v. Verde*, 2012 UT 60, ¶ 22, 296 P.3d 673).[4] "Short of that, however, the court's job under rule 404(b) is not to balance

_____

4. Of course, such evidence would not survive analysis under rule 403.

or weigh competing (proper and improper) inferences. Such weighing comes in under rule 403." *Id.* A district court then must "bind its analysis to the text of rule 403, considering those factors that are appropriate given the particular circumstances of the case." *State v. Lowther*, 2017 UT 34, ¶ 45.

¶41 "Stated succinctly, to be admissible, evidence of prior bad acts must be relevant and offered for a genuine, noncharacter purpose; furthermore, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841, *abrogated on other grounds by Thornton*, 2017 UT 9. We review each of the district court's evidentiary rulings below under these standards.[5]

A.    Yelling at the Children

¶42    The State contends that the prosecutor offered evidence that MacDonald yelled at Child and the other child to show MacDonald's motive (his "contempt" for Child), lack of accident, and context. During the roughly six weeks that Mother and Child lived with MacDonald, he "yelled constantly and

---

5. We commend the district court for addressing and scrupulously examining each bad act's admissibility separately. While recent case law makes clear that failure to "scrupulously examine" the evidence or to engage in a "separate analysis of distinct strands of prior misconduct evidence presented under rule 404(b)" is not automatically reversible error, nevertheless "the quality of appellate review [is] enhanced by a more fulsome statement of the district judge's analysis on the record." *State v. Thornton*, 2017 UT 9, ¶ 41, 391 P.3d 1016. And our supreme court advised that "[t]he careful trial judge will still proceed as outlined in our recent *Lucero* decision marching through the standards set forth in rules 404(b), 402, and 403, and presenting [the] analysis on the record." *Id*. ¶ 54.

excessively." The district court concluded that evidence that MacDonald yelled at the children was "offered to show that [MacDonald] was an impatient person and therefore more likely to have acted in accordance with that bad character trait on January 18, 2013" and was, therefore, offered for an impermissible purpose. The district court excluded the evidence.

¶43 The district court did not exceed its discretion in ruling that this evidence did not have, in the words of a later opinion from our supreme court, "a plausible, avowed purpose beyond the propensity purpose that the rule deems improper." *See Thornton*, 2017 UT 9, ¶ 58 (emphasis omitted). Rather, evidence that MacDonald yelled at the children was offered to prove that on a particular occasion MacDonald acted in conformity with a character trait. *See* Utah R. Evid. 404(b)(1). Accordingly, we affirm the district court's ruling excluding evidence that MacDonald yelled at the children.

B. Calling Child a "Whiner"

¶44 The State next contends that the district court abused its discretion in excluding evidence that MacDonald called Child a "whiner." The district court concluded that evidence that MacDonald called Child a "'whiner' does not manifest the kind of deep-seated contempt that would move a person to cause serious bodily injury." Thus, the court concluded, "the probative value of this statement is paper-thin and is substantially outweighed by the improper character purpose—[to show] that [MacDonald] is an impatient or bad father." The State argues that the evidence shows why MacDonald would have harmed Child on January 18. The State seeks to use it to counter anticipated defense testimony that MacDonald "loved" Child and had no reason to hurt him.

¶45 We cannot say that the district court exceeded its discretion in excluding, under rule 403, evidence that MacDonald called Child a "whiner." We thus affirm the ruling.

C.      Jealousy of Child

¶46     The State next challenges the district court's exclusion of evidence that MacDonald was jealous of Child. The State argues that the evidence was admissible under rules 401 and 402 of the Utah Rules of Evidence because "evidence showing that MacDonald was jealous of [Child] makes it more probable that he hurt him intentionally, rather than accidentally."

¶47     However, the district court did not exclude this evidence as irrelevant under rules 401 and 402, but as unhelpful under rule 701. To be admissible under rule 701 of the Utah Rules of Evidence, lay opinions must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue."

¶48     The district court ruled that MacDonald's "feeling of jealousy" "is not a prior bad act subject to Rule 404(b)." (Internal quotation marks omitted.) Rather, it determined that "the conclusion that [MacDonald] was jealous of [Child] constitutes the lay opinion of [Mother]" and "is not helpful to determining a fact in issue." The court explained that the "jealousy she describes is not manifest in ways that would suggest a deep-seated envy that would motivate [MacDonald] to commit a violent act against [Child]" and therefore "would not be helpful to the trier of fact."

¶49     We are not convinced that evidence that is admissible under rule 401 and 402 is necessarily admissible under rule 701. Rules 401 and 402 "establish a very low bar that deems even evidence with the slightest probative value relevant and presumptively admissible." *State v. Richardson*, 2013 UT 50, ¶ 24, 308 P.3d 526 (citation and internal quotation marks omitted). It is not obvious—and the State has not shown—that evidence meeting this low bar necessarily qualifies as "helpful to clearly understanding the witness's testimony or to determining a fact in issue" under rule 701. Because the State has failed to address

"the basis of the district court's ruling, we reject this challenge." *See Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 17, 241 P.3d 375.

### D. "Flipping Off" Child

¶50 The State contends that evidence that MacDonald "flipped off" Child on January 13 "has strong probative value" to demonstrate MacDonald's contempt for Child. The district court determined that evidence of the "prior bad act is offered for a proper non-character purpose—to show that the [MacDonald] had contempt for [Child]." But the court concluded that "the probative value of this evidence is thin" because "[f]lipping someone off—while an aggressive gesture—does not manifest an intent to kill or to do serious bodily injury." On the other hand, the court reasoned, the "risk of unfair prejudice is high" because the gesture may show that MacDonald "is an impatient or crude person."

¶51 The district court's balancing of the danger of unfair prejudice posed by this testimony against its probative value is well within the reasonable range and thus not an abuse of discretion. We affirm the district court's ruling on this issue.

### E. Prior Treatment of Child

¶52 The State also challenges the district court's exclusion of evidence that MacDonald mistreated Child. The evidence would show that MacDonald (1) picked Child up by the arms in a rough manner, carried him across the room, and dropped him onto a bean bag chair on several occasions, and (2) may have bruised Child's cheeks in administering Child's medicine. Specifically, the State argues that this evidence shows "MacDonald's motive for harming [Child]—namely his 'contempt' for him"—and "rebuts MacDonald's current claim that [Child] was injured accidentally." The district court ruled that because the State "does not contend that [Child] was injured

when [MacDonald] intentionally dropped him," "evidence that [MacDonald] intentionally dropped [Child] on prior occasions is not relevant and therefore inadmissible."

¶53    "Our child abuse case law clearly indicates that evidence of instances of uncharged abuse involving the same victim and the same defendant is admissible for proper noncharacter purposes." *State v. Killpack*, 2008 UT 49, ¶ 46, 191 P.3d 17, *abrogated on other grounds as recognized by State v. Lowther*, 2017 UT 34.[6] "[S]pecific instances of uncharged child abuse may be properly admitted as noncharacter evidence under rule 404(b) when offered to establish a specific pattern of behavior by the defendant toward one particular child, the victim." *Id.* (citation and internal quotation marks omitted). "Such evidence is often indicative of the defendant's state of mind and completes the story of the charged abuse." *Id.* (citation and internal quotation marks omitted). Further, "evidence of prior child abuse is allowed to show identity, intent or mental state, and lack of accident or mistake." *Id.* (citation and internal quotation marks omitted).

¶54    In *Killpack*, prior instances of abuse were relevant to demonstrate that the victim's death was not accidental. *Id.* ¶ 48. Although the victim died as a result of forced water intoxication, the prior instances of uncharged abuse—which included choking, hitting, and force-feeding—tended "to establish that Killpack had a specific pattern of" harming the victim. *Id.* ¶ 49.

---

6. Indeed, even evidence of prior acts of uncharged abuse of other children is admissible when the question of whether a victim's injuries were intentionally or accidentally inflicted is at issue. *See State v. Widdison*, 2001 UT 60, ¶¶ 44–45, 28 P.3d 1278 (concluding that evidence of prior abuse of other children "was relevant because it was introduced to show that [the victim's] injuries were not the result of an accident").

¶55 The district court ruled that evidence that MacDonald intentionally dropped Child on prior occasions was not relevant and therefore inadmissible because the State does not contend that Child's injuries resulted from an intentional drop. But this prior treatment of Child tends "to establish that [MacDonald] had a specific pattern of" harming Child and that the incident on January 18 was perhaps not an accident. *See id.* ¶¶ 46, 49. And because prior evidence of abuse, even when the prior abuse was inflicted in a different manner than the charged abuse, is admissible to show "identity, intent or mental state, and lack of accident or mistake," the district court exceeded its discretion in excluding evidence that MacDonald intentionally dropped Child on prior occasions. *See id.* ¶ 46 (citation and internal quotation marks omitted).

¶56 The district court also ruled that "there does not appear to be a proper non-character purpose" for introducing evidence of Child's bruised cheeks. The district court ruled that even if there was a proper non-character purpose, "the probative value of this evidence is substantially outweighed by the danger of unfair prejudice," in part because the court saw "little similarity between the mechanism of injury to [Child's] cheeks and the mechanism of injury that caused [Child's] brain damage."

¶57 It is true that the alleged bruising of Child's cheeks is not the same mechanism of injury that, the State alleges, caused Child's brain damage. But the rule as we understand it does not require that level of similarity. Rule 404(b) excludes evidence offered to prove that the accused acted in conformity with his character or a trait of character on the occasion in question. *See* Utah R. Evid. 404(b). But, as stated in *Killpack*, evidence may be admitted "to establish a specific pattern of behavior by the defendant toward one particular . . . victim." *See id.* In addition, the evidence in question here had a tendency to rebut MacDonald's claim that Child's injuries were the result of an accident.

¶58 Evidence may of course be relevant under rule 402 and offered for a non-character purpose under rule 404(b) but still be inadmissible under rule 403. Indeed, the purpose of rule 403 is "to exclude otherwise admissible evidence," *State v. Allen*, 2005 UT 11, ¶ 24, 108 P.3d 730, whose probative value is nonetheless substantially outweighed by the danger that it will cause unfair prejudice, confuse the issues, mislead the jury, and so forth, *see* Utah R. Evid. 403. Moreover, as noted in *Thornton*, the fact that evidence may serve a proper purpose does not mean that it may not also serve an improper one. *See State v. Thornton*, 2017 UT 9, ¶¶ 58–59, 391 P.3d 1016. In such situations, rule 403 prescribes the test for determining whether the cost of the admission of otherwise admissible evidence is too high.

¶59 Here, the trial court performed the rule 403 weighing and concluded that the danger of unfair prejudice substantially outweighed the probative value of the evidence. But it did so only after ruling that the evidence served no permissible purpose. We have now reversed that ruling. Accordingly, we remand the question back to the trial court to reweigh the evidence under rule 403 in light of this opinion.

## CONCLUSION

¶60 For the foregoing reasons, we reverse the decision of the district court to suppress MacDonald's written statement and his first and second interviews. We also reverse the decision of the district court to exclude evidence of MacDonald's prior abuse of Child. We affirm on all other grounds and remand for further proceedings.

———