**2019 UT App 152**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BLANE SCOTT FREDRICK,
Appellant.

Opinion
No. 20180441-CA
Filed September 19, 2019

Fifth District Court, Cedar City Department
The Honorable Keith C. Barnes
The Honorable G. Rand Beacham
No. 131500581

Jonathan T. Nish, B. Kent Morgan, and R. Spencer
Robinson, Attorneys for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER concurred.
JUDGE DAVID N. MORTENSEN concurred, with opinion.

HARRIS, Judge:

¶1     A jury convicted Blane Scott Fredrick of two counts of
aggravated sexual abuse of a child, and he now appeals,
asserting that the trial court improperly allowed various items of
evidence to be introduced during his trial. We find no merit in
Fredrick's arguments, and therefore affirm his convictions.

BACKGROUND[1]

¶2     When K.R. was approximately one year old, her parents determined that they needed to find a long-term day care option. K.R.'s parents knew and trusted Fredrick and his wife, as they were neighbors and attended the same church. Fredrick and his wife were also out of work at the time, and K.R.'s parents thought the Fredricks could use the extra money. For these reasons, K.R.'s parents hired Fredrick and his wife, who provided day care services for K.R. for the next eight years.

¶3     Both Fredrick and his wife shared day care duties, but over time Fredrick became the primary caregiver for K.R. Before K.R. was of school age, her mother would drop her off at Fredrick's house in the morning and pick her up in the evenings; once K.R. was old enough to attend school, K.R.'s mother would drop her off at school and Fredrick would pick her up from school and attend to her until her mother came to pick her up at Fredrick's house. Over the years, K.R. came to view Fredrick as a "second father," often referring to him as "Daddy Blane."

¶4     One evening, when K.R. was nine years old, she reported to her mother that "Daddy Blane has touched me in my privates." Her mother, who was training to be a clinical therapist, instructed K.R. to "go and get her doll" and demonstrate on the doll how Fredrick had touched her. K.R. proceeded to "set the doll on her lap" and "put her arm around the doll and put her hand in between the doll's legs." K.R. explained that this "happened quite often," and that it occurred in the basement while she and Fredrick watched cartoons together. The next morning, K.R.'s mother contacted Child

---

1. Fredrick "is appealing from a jury verdict; thus we recite the facts in a light most favorable to the jury's verdict, but present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *State v. Garcia-Mejia*, 2017 UT App 129, ¶ 2, 402 P.3d 82 (quotation simplified).

Protective Services (CPS), which scheduled an interview for K.R. at the Children's Justice Center (CJC Interview).

¶5    The CJC Interview occurred a few weeks later, and was conducted by a police detective (Detective). During the interview, K.R. told Detective that, while Fredrick was taking care of her after school, they would go downstairs to the basement together to watch cartoons. K.R. reported that she "would sit on [Fredrick's] lap and then he would put his hand down [her] pants and just play around with [her] private spot" with his eyes closed. Although this made her feel "anxious," "nervous and scared," K.R. did not tell Fredrick to stop because she "didn't really want to hurt his feelings." She explained that similar touching had occurred every "two to three weeks" beginning when she was around seven years old.

¶6    Two days after his interview with K.R., Detective went to Fredrick's house, knocked on the door, and introduced himself to Fredrick. He explained to Fredrick that he wanted to talk to him about "an important issue"—although he did not specify what the issue was—and asked him to come to the police station. Without asking any questions, Fredrick agreed to do so, and a few minutes later drove himself in his own vehicle to the station.

¶7    After he arrived at the police station, Fredrick was ushered into a small interview room containing a table and two chairs; because no one else was in the room at the time, Fredrick chose which chair he wanted to sit in. Fredrick was allowed to maintain possession of his personal effects, including his phone, wallet, and keys, and was not restrained (e.g., handcuffed) in any way. A few minutes later, Detective entered the room and sat in the only remaining chair, which happened to be the one closer to the door. Detective shut the door behind him, but did not lock it. Detective was dressed in a police polo shirt and dark pants, rather than a full police uniform; no sidearm or weapon was readily apparent on Detective's person, and at no point did Detective display a gun or weapon.

¶8     Detective began the interview by expressly advising Fredrick that he was "not under arrest" and that he had certain rights, including the right to "stop answering questions" at "any time during questioning." Detective attempted to inform Fredrick of his *Miranda*[2] rights, but did not include the warning that any statements Fredrick might make could be used against him in court. Fredrick responded by stating that he "wish[ed] to waive" his rights so that he could talk with Detective.

¶9     After some initial pleasantries and background inquiries, Detective asked Fredrick about K.R. At first, Fredrick told Detective that there had been no inappropriate physical contact, but as the interview progressed Fredrick admitted "a little bit at a time" that there had been some touching. First, Fredrick explained that, at K.R.'s request, he would tickle her back, arms, and stomach while they watched television. Next, Fredrick stated that, one day as he was tickling K.R.'s stomach, he realized that he had "touched the top of her panties." Finally, Fredrick admitted that while he was tickling K.R.'s stomach his hand "went under her panties and touched her vagina." Fredrick maintained that this had occurred only once, and he denied any other inappropriate touching. Detective was not convinced by Fredrick's denial of additional touching, and at the conclusion of the two-hour interview he informed Fredrick that he was now under arrest. At that point, Detective took custody of Fredrick's personal effects and detained him.

¶10    The State later charged Fredrick with two first-degree felony counts of aggravated sexual abuse of a child, with the aggravator being Fredrick's position of special trust in relation to K.R. As the case proceeded toward trial, local law enforcement officials learned that the Utah Attorney General's Office, in connection with a separate investigation, had discovered a series of emails and other online correspondence between Fredrick and another individual related to previous acts of child molestation

---

2. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

and their shared sexual interest in children. The State subsequently filed a notice of intent to introduce some of this evidence (Electronic Evidence) at Fredrick's trial.

¶11    Fredrick then filed several motions to exclude evidence. First, Fredrick objected to the State's attempt to introduce the CJC Interview at trial. In the objection, Fredrick argued that the CJC Interview was inadmissible under both rule 15.5 of the Utah Rules of Criminal Procedure and rule 807 of the Utah Rules of Evidence. Specifically, he asserted that admission under rule 15.5 was improper because the "interview is not reliable and trustworthy" due to Detective's allegedly inadequate or flawed questioning and K.R.'s allegedly vague and confusing responses to some of Detective's questions. At some point during the first day of trial, the court overruled Fredrick's objection to admission of the CJC Interview, including his specific objection regarding reliability under rule 15.5, but the record submitted to us on appeal does not contain any transcript of the trial court's ruling.[3]

¶12    Second, Fredrick moved to suppress all evidence arising from his police interview on the ground that he was subjected to custodial interrogation without proper *Miranda* warnings. The

---

3. We know the trial court made this ruling because Fredrick, in a motion for a new trial filed after the jury's verdict, stated specifically that, "[o]n or about [the first day of trial], the Court [found] that the CJC Interview did not lack reliability [or] trustworthiness, and pursuant to Rule 15.5 of the Utah Rules of Criminal Procedure, the CJC Interview would be allowed to be played during the trial." And a few weeks later, at Fredrick's sentencing hearing, his attorney stated in open court that "Your Honor did make a ruling that [the CJC Interview] was inherently reliable and trustworthy." Thus, we are in the unusual position of being quite certain that the trial court made a specific ruling on Fredrick's rule 15.5 objection even though we do not have a record of that ruling.

trial court denied this motion, determining that Fredrick was not in custody when he admitted to touching K.R.

¶13 Third, Fredrick filed a motion in limine to exclude the Electronic Evidence discovered by the Attorney General, arguing that the evidence should be excluded pursuant to rule 403 of the Utah Rules of Evidence. Specifically, he asserted that the Electronic Evidence had "little to no direct relevance" to the current charges; its "vulgar and repulsive" nature would "shock a jury and breed an emotional response where [it would] want to punish" Fredrick; and "any probative value . . . [was] substantially and overwhelmingly outweighed by the risk of unfair prejudice." Fredrick asked the court to exclude all of the Electronic Evidence, and made no argument that some of the evidence might be partially admissible through redactions or limitations. After oral argument, the trial court partially granted Fredrick's motion by excluding six pieces of evidence that the State sought to introduce, but denied Fredrick's motion with regard to fourteen other pieces of evidence, ruling that this evidence was admissible under rules 404(b)(2) and 404(c) of the Utah Rules of Evidence, and that its probative value was not substantially outweighed by the risk of unfair prejudice.

¶14 K.R. turned fourteen just a few weeks prior to Fredrick's trial. At trial, the court allowed the State to present the CJC Interview and Fredrick's confession to the jury. In addition, the State presented seven (of the fourteen allowable) pieces of Electronic Evidence to the jury, at least one of which had been admitted solely pursuant to rule 404(c). After hearing this and other evidence, the jury convicted Fredrick on both counts.

¶15 After the verdict, Fredrick filed a motion to arrest judgment and for a new trial on the ground that the CJC Interview should not have been played for the jury because K.R. was not under the age of fourteen at the time of Fredrick's trial. The trial court denied the motion, and later sentenced Fredrick to prison terms of fifteen years to life on each of the counts, with the sentences to run concurrently.

ISSUES AND STANDARDS OF REVIEW

¶16 Fredrick appeals his convictions, and asserts that the trial court erroneously admitted three categories of evidence. First, he contends that the trial court erred in admitting the recorded CJC Interview. "Whether the trial court correctly admitted the [CJC Interview] into evidence pursuant to rule 15.5 is a question of law that we review for correctness." *State v. Cruz*, 2016 UT App 234, ¶ 16, 387 P.3d 618.

¶17 Second, Fredrick contends that the trial court erred in admitting his recorded police interview. Fredrick asserts that the interview was not admissible because it was taken during a custodial interrogation for which he received only partial *Miranda* warnings. "We review a trial court's determination of custodial interrogation for *Miranda* purposes for correctness." *State v. Fullerton*, 2018 UT 49, ¶ 12, 428 P.3d 1052.

¶18 Third, Fredrick contends that the trial court erred in allowing the State to use certain pieces of Electronic Evidence. "We afford [trial] courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion. But whether the [trial] court applied the proper legal standard in assessing the admissibility of that evidence is a question of law that we review for correctness." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (quotation simplified).

ANALYSIS

I.  CJC Interview

¶19 Fredrick contends, for two reasons, that the trial court's admission of the CJC Interview was improper. First, he asserts that, because K.R. was fourteen years old at the time of trial, her recorded statement—given five years earlier, when she was nine—cannot be admitted under rule 15.5 of the Utah Rules of

Criminal Procedure. Second, he contends that the trial court failed to make a sufficiently detailed ruling on his objection that the CJC Interview was not reliable enough to justify admission. We reject both arguments.

A

¶20    Fredrick's first argument is unpreserved. Fredrick correctly points out that he lodged a timely pretrial objection to admission of the CJC Interview, but he overlooks the fact that this objection did not include any argument related to K.R.'s age. In that pretrial objection, Fredrick made two arguments against admission of the CJC Interview: (1) the interview was not sufficiently reliable and trustworthy and that its admission was not in the interest of justice, as those terms are used in rule 15.5(a)(8) of the Utah Rules of Criminal Procedure; and (2) the CJC Interview should not be admitted pursuant to rule 807 of the Utah Rules of Evidence. Fredrick raised no argument that the CJC Interview should not be played for the jury because K.R. would be fourteen years old at the time of trial; indeed, Fredrick's counsel later acknowledged that, at the time he filed the objection, he did not realize that K.R. had just turned fourteen, and that he did not become aware of K.R.'s age at trial until K.R. herself testified—at trial, right after the CJC Interview had been played for the jury—that she had just turned fourteen.

¶21    Fredrick did raise this issue in a post-trial motion. But this is insufficient to preserve the issue, where Fredrick became aware of K.R.'s age—and, by extension, the basis for an objection on this issue—during trial. Our supreme court has explained that raising an objection that could have been raised at trial for the first time in a post-trial motion is insufficient to preserve the issue for appellate review, because doing so deprives the trial court of "an opportunity to address the claimed error, and if appropriate, correct it." *State v. Fullerton*, 2018 UT 49, ¶ 49 n.15, 428 P.3d 1052 (quotation simplified); *see also Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828 (noting that "the preservation rule furthers judicial economy" and "avoids

unnecessary appeals and retrials" by requiring parties "to raise an issue or argument in the trial court" so that the trial court has "an opportunity to address the claimed error" in time to correct it, if appropriate (quotation simplified)). In such a situation, the issue "cannot be raised on appeal unless the proponent can show plain error or exceptional circumstances." *Fullerton*, 2018 UT 49, ¶ 49; *see also State v. Davie*, 2011 UT App 380, ¶ 15, 264 P.3d 770 ("When a party raises an issue on appeal without having properly preserved the issue below, we require that the party articulate an appropriate justification for appellate review; specifically, the party must argue either plain error or exceptional circumstances." (quotation simplified)).

¶22  In this case, however, Fredrick does not ask us to review this issue for plain error, and does not contend that exceptional circumstances exist. Accordingly, we do not further address his unpreserved claim.[4] *See State v. Hodges*, 2002 UT 117, ¶ 5, 63 P.3d

---

4. Even if Fredrick had asked us to review this issue for plain error, we would have been hard-pressed to find it. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. If any one of these requirements is not met, plain error is not established." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). At the time it admitted the CJC Interview into evidence, the trial court was no more aware of K.R.'s exact age than counsel was, and it is not plain error for a trial court to fail to act on information that it does not have. Moreover, the interpretation of rule 15.5 advanced by Fredrick is not obviously correct. Neither side directs our attention to any Utah case law specifying whether the reference to a victim's age contained in this phrase of rule 15.5—"the oral statement of a victim . . . younger than 14 years of age which was recorded prior to the filing of an information"—refers to the victim's age at the time of trial, or the victim's age at the time the statement is given. In the absence of any definitive case law to the contrary, it would be difficult for

(continued…)

66 ("Because defendant has not asserted either of the exceptions to the general rule—plain error or exceptional circumstances—we decline to address [his claims]."); *State v. Soules*, 2012 UT App 238, ¶ 8, 286 P.3d 25 (stating that where the defendant "does not assert plain error or exceptional circumstances[,] . . .we do not address the merits" of the claim).

B

¶23    Although Fredrick failed to preserve any objection to the admission of the CJC Interview related to K.R.'s age, he did timely raise a separate objection to the interview's admission: he asked the trial court to exclude the interview on the ground that it did not comport with rule 15.5(a)(8) of the Utah Rules of Criminal Procedure. Although we have not been provided with any record of the trial court's ruling on this issue, we know that the court specifically overruled Fredrick's objection and determined that the CJC Interview was both reliable and trustworthy. *Supra* ¶ 11 & n.3. Fredrick now assails that ruling, asserting that it was insufficient because it did not contain "specific findings regarding the accuracy or reliability" of the CJC Interview. Fredrick's appellate argument fails because he has not provided us with a record of the trial court's ruling, and in the absence of such a record, we are bound to presume the regularity of the proceedings below.

¶24    As the party seeking appellate review of the trial court's rulings, Fredrick has "the duty and responsibility to support [his] allegations with an adequate record." *State v. Snyder*, 932 P.2d 120, 131 (Utah Ct. App. 1997) (quotation simplified). "When crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court."

---

(…continued)

us to conclude that the State's interpretation (i.e., that the age reference is to the victim's age at the time the statement is given) is obviously incorrect.

*State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (quotation simplified). Thus, "when an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below." *Id.*; *see also Snyder*, 932 P.2d at 131 (reasoning that, without an adequate record, a "defendant's assignment of error stands as a unilateral allegation which the review court has no power to determine" (quotation simplified)).

¶25 Here, Fredrick has not provided us with a transcript, minute entry, or any other type of record detailing the trial court's pretrial ruling regarding the admissibility of the CJC Interview. But we know the trial court made such a ruling, because Fredrick himself said so both in writing and in open court. In a post-trial motion, Fredrick wrote that, "[o]n or about [the first day of trial], the [court found] that the CJC Interview did not lack reliability [or] trustworthiness, and pursuant to Rule 15.5 of the Utah Rules of Criminal Procedure, the CJC Interview would be allowed to be played during the trial." And at his sentencing hearing a few weeks later, Fredrick's attorney stated that "Your Honor did make a ruling that [the CJC Interview] was inherently reliable and trustworthy," and the trial court confirmed that the admissibility of the CJC Interview "was an issue that was addressed prior to trial."

¶26 But the record before us contains no transcript or other record of any such specific ruling. Fredrick's appellate challenge to that ruling—that it did not contain "specific findings regarding the accuracy or reliability" of the CJC Interview—is particularly one that requires us to examine the ruling. Without an ability to scrutinize the ruling for particular findings or conclusions, we have no way to determine whether the ruling in fact contained the "specific findings" that Fredrick now claims that it lacked. This is precisely the sort of situation in which we must "presume the regularity of the proceedings below," *Pritchett*, 2003 UT 24, ¶ 13, and we therefore conclude that Fredrick has not carried his burden on appeal of persuading us that the trial court committed error. Accordingly, we decline to address Fredrick's argument.

## II. Police Interview

¶27　Fredrick next argues that the trial court improperly denied his motion to suppress the police interview containing his confession. Fredrick contends that the interview was conducted in violation of his Fifth Amendment rights, a contention that is premised on two assertions: (1) that he was "in custody" for the purposes of *Miranda*, and (2) that he was given an insufficient *Miranda* warning prior to making his confession. The State acknowledges Fredrick's second point, and makes no effort to defend the sufficiency of the *Miranda* warning afforded to Fredrick.[5] However, the State vigorously contests Fredrick's first assertion, and takes the position that Fredrick was not "in custody" until the end of the interview, after his confession, when Detective placed him under arrest. For the reasons that follow, we think the State has the better of the argument.

¶28　The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right against self-incrimination, the United States Supreme Court held, in *Miranda v. Arizona*, 384 U.S. 436 (1966), that individuals who are in police custody must be apprised of their rights prior to any questioning. *Id.* at 478–79. In so doing, the officer must inform the suspect that "he has the right to remain silent," "anything he says can be used against him in a court of law," "he has the right to the presence of an attorney," and "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

---

5. Detective did not warn Fredrick that "anything he said could be used against him in court." *See Miranda*, 384 U.S. at 469 ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.").

¶29 Because these safeguards apply only "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way," *id.* at 478, a threshold inquiry in any *Miranda* challenge is whether the defendant was in custody at the time of questioning, *see State v. Fullerton*, 2018 UT 49, ¶ 19, 428 P.3d 1052. In this context, "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). To determine whether a suspect is in custody for the purposes of *Miranda*, the United States Supreme Court has developed a two-part test. "The initial step is to ascertain whether, in light of the objective circumstances of the interrogation a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (quotation simplified). If "an individual's freedom of movement was curtailed," the court must then determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

¶30 The first part of this inquiry—whether a reasonable person would have felt free to leave—is an objective one. *See J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (stating that the inquiry "involves no consideration of the actual mindset of the particular suspect" because "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant" (quotation simplified)). Accordingly, "in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation." *Howes*, 565 U.S. at 509 (quotation simplified); *see also J.D.B.*, 564 U.S. at 270 (refusing to "demarcate a limited set of relevant circumstances"). Some relevant factors identified by the Supreme Court include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the

questioning."[6] *Howes*, 565 U.S. at 509 (quotation simplified). In addition, the Court has also considered "whether the police transported the interviewee to the station or required him to arrive at a specific time, whether the police threatened him with arrest, the focus of the questioning, and whether he wanted breaks." *Fullerton*, 2018 UT 49, ¶ 25 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In short, Fredrick was entitled to a *Miranda* warning only if he was "in custody" during questioning, an inquiry that is informed by considering whether "a reasonable person, based on all of the objective circumstances

---

6. Over thirty years ago, our supreme court identified "four of the most important factors in determining whether an accused who has not been formally arrested is in custody." *Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983). These factors, known as the *Carner* factors, are "(1) the site of the interrogation; (2) whether the investigation focused on the accused; (3) whether objective indicia of arrest were present; and (4) the length and form of interrogation." *Id.* In times gone by, our supreme court sometimes treated the *Carner* factors as a comprehensive and complete list of relevant considerations. *See, e.g.*, *State v. Wood*, 868 P.2d 70, 82 (Utah 1993) (citing *Carner*, and stating that "[f]our factors determine whether an accused who has not been formally arrested is 'in custody' for *Miranda* purposes"). Recently, however, the court noted that, "[w]hile these four factors may, at times, be relevant in a custody analysis," "[s]trict or sole reliance on the *Carner* factors is inconsistent with . . . federal law," which dictates that the "custody" question must be answered based on the "totality of the circumstances." *State v. Fullerton*, 2018 UT 49, ¶ 23, 428 P.3d 1052. Accordingly, proper use of the *Carner* factors—which overlap to some extent with those identified by the United States Supreme Court in *Howes v. Fields*, 565 U.S. 499 (2012)—"requires considering them in conjunction with all other relevant circumstances." *Fullerton*, 2018 UT 49, ¶ 24. Each factor "should be considered when relevant, ignored when not, and given appropriate weight according to the circumstances." *Id.* ¶ 23.

surrounding the interrogation, would have felt free to terminate the interview and leave." *Id.* ¶ 26.

¶31     In this case, there are a number of factors supporting Fredrick's position that a reasonable person would not have felt free to leave during the interview. For example, the interview occurred at the police station, in a small interview room in which Detective sat in the chair nearest to the door; the interview lasted about two hours; the questioning was clearly focused on Fredrick as a suspect; Detective attempted to give Fredrick a *Miranda* warning, possibly indicating that Detective believed that the situation required one; Detective never expressly told Fredrick that he was free to leave; and Detective arrested Fredrick at the conclusion of the interview.

¶32     But, as the State points out, significant factors also point in the opposite direction. Fredrick voluntarily drove himself to the police station in his own vehicle, and (until his post-interview arrest) retained possession of his phone, wallet, and keys. Fredrick chose to sit in the chair farthest from the door in the interview room. The door to the interview room was shut, but remained unlocked the entire time. At no point during the interview was Fredrick handcuffed or restrained in any way; indeed, at the beginning of the interview, Detective explicitly told Fredrick that he was "not under arrest" and that he could "stop answering questions" at "any time during questioning." Detective was not wearing his full police uniform; instead, he was dressed in a police polo shirt and dark pants. No sidearm or weapon was readily apparent on Detective's person, and at no point did Detective display a gun or any other weapon. While Detective did focus his questioning on Fredrick, he maintained a respectful and accommodating tone throughout the interview.

¶33     When we consider these facts in their totality, we conclude that "a reasonable person in [Fredrick's] position would have felt free to terminate the interview and leave." *See id.* ¶ 30. While relevant, the location and the duration of the questioning are not dispositive. *See Howes*, 565 U.S. at 515

(finding that an interview lasting for between "five and seven hours" was not enough alone to show that *Miranda*'s custody requirement had been met); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (stating that the requirement of *Miranda* warnings is not "to be imposed simply because the questioning takes place in the station house"). Indeed, the location of the questioning must be weighed against whether the defendant voluntarily chose to attend. *State v. Fuller*, 2014 UT 29, ¶ 45, 332 P.3d 937. In this case, although the interview was at the police station, Fredrick attended the interview of his own volition. *See Yarborough*, 541 U.S. at 664 (noting that certain facts weighed against finding that the defendant was in custody, including that "[t]he police did not transport [him] to the station"); *Fullerton*, 2018 UT 49, ¶ 31 (finding that the defendant who "voluntarily had his father drive him to the police station" and had his father "wait[] at the station for him" was not in custody); *Fuller*, 2014 UT 29, ¶¶ 45, 47 (concluding that the defendant was not in custody although the interrogation took place in a police car because the defendant voluntarily entered the car and the doors remained unlocked during the interview).

¶34    Moreover, during the interview, Fredrick was not restrained, the door to the interview room was never locked, and Detective was dressed casually and did not have any apparent weapon. *See Fuller*, 2014 UT 29, ¶ 48 (listing handcuffs, drawn guns, and locked doors as "objective indicia of arrest" (quotation simplified)); *State v. MacDonald*, 2017 UT App 124, ¶ 29, 402 P.3d 91 (concluding that circumstances suggesting the defendant was not in custody included a lack of physical restraints, officers that were in plain clothes with no visible weapons, and the interview room remained unlocked); *State v. Reigelsperger*, 2017 UT App 101, ¶ 58, 400 P.3d 1127 (same).

¶35    Significantly, Detective expressly told Fredrick that he was not under arrest and that he could terminate the interview at any time. While it would have been better if Detective had also plainly stated that Fredrick was free to leave, we conclude that a reasonable person who hears that he is not under arrest

and is free to refuse to answer questions would likely believe that he was free to leave. *See Mathiason*, 429 U.S. at 495 (recognizing that the defendant "was immediately informed that he was not under arrest," which was an "indication that the questioning [did not take] place in a context where [the defendant's] freedom to depart was restricted in any way"); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (quotation simplified)); *Fullerton*, 2018 UT 49, ¶ 32 (weighing police assurance to the defendant that he "was not under arrest" against finding the defendant was in custody). Fredrick points to Detective's decision to attempt to issue a *Miranda* warning as a factor in his favor, but Detective's decision may have simply been a precaution and demonstrates, at most, his own subjective belief that such a warning was necessary, a factor that is not relevant to the inquiry. *See J.D.B.*, 564 U.S. at 271 (stating that "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant" (quotation simplified)); *see also United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977) ("The precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes."); *United States v. Oldman*, 156 F. Supp. 2d 1252, 1260 (D. Utah 2001) ("The mere provision of *Miranda* warnings does not itself convert an otherwise non-custodial interview into a custodial interrogation." (quotation simplified)).

¶36    Finally, Detective maintained a calm demeanor and never raised his voice. *See Fullerton*, 2018 UT 49, ¶ 34 (noting that "the officers never rais[ing] their voices" during questioning supported that an interview was non-custodial in nature); *MacDonald*, 2017 UT App 124, ¶ 35, ("[T]he questioning, though at times pointed, was calm, respectful, and not sufficiently

coercive to render the interview custodial."). Detective reminded Fredrick that he expected him to be "completely fair and honest" and that there could be negative ramifications should Fredrick lie. *See Yarborough*, 541 U.S. at 664 ("Instead of pressuring [the defendant] with the threat of arrest and prosecution, [the officer] appealed to [the defendant's] interest in telling the truth and being helpful to a police officer."). However, Detective never threatened Fredrick or attempted to overstate potential consequences for dishonesty. Each time Detective believed Fredrick was lying, he simply stated as much and gave Fredrick the opportunity to revise his statement. And Fredrick appeared willing to answer Detective's questions and even expressed how "relieved" he was to explain what had happened because he had "been trying to get rid of [the] guilt for so long." *See Reigelsperger*, 2017 UT App 101, ¶ 58 (concluding that a defendant was not in custody in part because, "although [the defendant] was not told that he could leave, he appeared rather eager to tell his side of the story" and the detectives did not "engage[] in coercive tactics" (quotation simplified)).

¶37  In the end, we are unable to meaningfully distinguish the facts of this case from the facts of *Fullerton*, a case in which our supreme court recently determined that a similar interview was non-custodial. *See* 2018 UT 49, ¶¶ 27–36. In both cases, the defendant voluntarily traveled to the police station. Once at the station, both defendants were shown to a small interview room, the door to which was shut but not locked; indeed, the officers conducting the interviews came and went multiple times. Both defendants were expressly told that they were not under arrest. Once the interview began, both defendants remained unrestrained for the duration of the interview, which was roughly the same in both cases (ninety minutes in *Fullerton*, two hours here), and both interviews were conducted by one officer dressed casually and with no visible weapon. In both interviews, the officers were focusing on the defendants as potential suspects, although throughout the course of both interviews the officers maintained a calm demeanor and never raised their voices, even when they suspected that the defendants were

lying. And at the end of both interviews, the defendants were arrested and taken into custody.

¶38 We can discern only three potential differences between the facts of this case and the facts of *Fullerton*: (1) in *Fullerton*, in addition to informing the defendant that he was not under arrest, officers also expressly told the defendant that he was free to leave; (2) in our case, officers attempted to give a *Miranda* warning, whereas in *Fullerton* they made no such attempt; and (3) in our case, officers hinted at "taking legal action" in the event that Fredrick was "not being honest," and there is no indication that officers made similar statements in *Fullerton*. But we do not think these three differences are material enough to make this case come out differently than *Fullerton*. Although Detective did not expressly tell Fredrick that he was free to leave, he did tell him that he was not under arrest and that he was free to terminate the interview and stop answering questions; while it would have been better if Detective had also made plain that Fredrick was free to leave, we think a reasonable person in Fredrick's position would have understood from Detective's instructions that he was indeed free to leave. And as noted above, the fact that Detective attempted to give Fredrick a *Miranda* warning may have just been a precaution and was, at most, an indication of Detective's subjective beliefs, rather than an objective indication of Fredrick's lack of freedom. And while Detective did attempt to explain to Fredrick that there could be consequences for dishonesty, we do not view Detective's comments as an indication that Fredrick was no longer free to terminate the interview; rather, we construe Detective's comments as a simple warning that, if Fredrick chose to answer questions, he should do so honestly.

¶39 In short, we are unable to meaningfully distinguish this case from *Fullerton*. If the defendant in *Fullerton* was not in custody, then neither was Fredrick. After examining the totality of the circumstances in this case, and comparing those circumstances with those presented in *Fullerton*, we agree with the trial court's conclusion that "Fredrick was not in custody or

deprived of his freedom of action in any significant way while he was being questioned by [Detective]," because "a reasonable person in [Fredrick's] position would not . . . have felt that their freedom of action was curtailed in a significant way." Accordingly, we affirm the trial court's decision to deny Fredrick's motion to suppress the police interview.

### III.  Electronic Evidence

¶40    Finally, Fredrick argues that the trial court erred in allowing the State to use up to fourteen pieces of Electronic Evidence, only seven of which the State actually introduced at trial. Most of those items were admitted pursuant to rule 404(c) of the Utah Rules of Evidence. Fredrick assails the court's decision to admit the evidence pursuant to rule 404(c),[7] contends that the court failed to properly analyze whether the evidence was relevant under rule 402 or unfairly prejudicial under rule

---

7. Of the fourteen items that the trial court permitted the State to introduce, the court declared some of them admissible under rule 404(b)(2) of the Utah Rules of Evidence, some admissible under rule 404(c), and some admissible under both rules. Although not every item the trial court allowed the State to introduce was actually used at trial, the State acknowledges that at least one of the items used at trial was admitted solely under rule 404(c). Fredrick does not challenge the trial court's decision to admit any of the Electronic Evidence pursuant to rule 404(b)(2), and his failure to address an alternative ground for the trial court's decision to admit the Electronic Evidence is fatal to his appellate challenge to the evidence also admitted under rule 404(b)(2). *See State v. Paredez*, 2017 UT App 220, ¶ 13, 409 P.3d 125 ("We will not reverse a district court's denial of a motion when the appellant fails to challenge the district court's independent alternative grounds for denying that motion."). But because at least one of the items of Electronic Evidence was apparently admitted solely under rule 404(c), we proceed to address the merits of Fredrick's rule 404(c) challenge.

403, and asserts that a proper analysis under these rules "would have required exclusion of the evidence."

¶41     Under the Utah Rules of Evidence, evidence of a person's prior bad acts is generally not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). This general rule is subject to a number of exceptions, most notably rule 404(b)(2), which allows evidence of a defendant's prior bad acts to be admitted, so long as there is—in addition to the generally-forbidden propensity inference—a proper non-character purpose for admission of that evidence. *See State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (stating that "[t]he threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the *propensity* purpose that the rule deems improper," and that "[i]f it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)").

¶42     But in child molestation cases, prosecutors need not go through the exercise of articulating a non-propensity purpose for evidence "that the defendant committed any other acts of child molestation." Utah R. Evid. 404(c)(1). The drafters of our rules of evidence have determined, as a policy matter, that propensity evidence in child molestation cases can come in on its own terms, as propensity evidence, even if there is no other plausible or avowed purpose for such evidence. Indeed, rule 404(c) plainly states that, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." *Id.*; *see also State v. Cuttler*, 2015 UT 95, ¶ 26, 367 P.3d 981 ("Rule 404(c)(1) explicitly allows [admission of evidence of prior acts of child molestation] for the purpose of proving a defendant's propensity to commit the child molestation with which he is charged" (quotation simplified)).

¶43 Even though prosecutors need not articulate a non-character purpose for evidence of previous acts of child molestation in order to win its admission, they still must demonstrate that the proposed evidence comports with rules 402 and 403 of the Utah Rules of Evidence. *See State v. Ring*, 2018 UT 19, ¶ 27, 424 P.3d 845 (applying a rule 403 balancing analysis to rule 404(c) evidence); *Cuttler*, 2015 UT 95, ¶ 15 ("Prior child molestation evidence that is admissible under rule 404(c) is subject to rule 403." (quotation simplified)); *State v. Nelson-Waggoner*, 2000 UT 59, ¶ 26, 6 P.3d 1120 ("Bad acts evidence, like all evidence, must be relevant or it is inadmissible."). In this context, however, the rule 402 relevance inquiry will generally be not much more than a formality: rules 401 and 402 pose only a low bar to the admission of evidence, *see* Utah R. Evid. 401 (stating that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action"); *see also State v. Reece*, 2015 UT 45, ¶ 64, 349 P.3d 712 ("Evidence that has even the slightest probative value is relevant under the rules of evidence." (quotation simplified)), and evidence that a defendant accused of child molestation committed previous acts of child molestation will almost certainly be relevant, *see State v. Murphy*, 2019 UT App 64, ¶ 47, 441 P.3d 787 (Harris, J., concurring) (stating that propensity evidence is typically excluded by our evidentiary rules "not because it has no appreciable probative value, but because it has too much" (quotation simplified)). In considering whether a defendant sexually abused a child victim, a jury might find it extremely probative to learn that the same defendant sexually abused other children on previous occasions.

¶44 The rule 403 analysis to which rule 404(c) evidence must be subjected begins in the same place as any other rule 403 analysis: with the text of the applicable rule. *See Cuttler*, 2015 UT 95, ¶ 18 (directing courts to apply the text of rule 403 to questions regarding the admissibility of rule 404(c) evidence, and not to limit themselves to the factors listed in *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988)). Under that rule,

evidence is to be excluded from trial "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. In administering the rule 403 balancing test, a court may consider any appropriate factor. *See Cuttler*, 2015 UT 95, ¶¶ 16–21 & n.5 (stating that a court may "consider many factors," including but not limited to the *Shickles* factors, except that courts may not consider "the degree to which the evidence probably will rouse the jury to overmastering hostility" (quotation simplified)).

¶45    But there is one crucial difference between the rule 403 analysis applied to evidence admitted pursuant to rule 404(c), as compared to the rule 403 analysis applied to evidence admitted pursuant to rule 404(b). Evidence admitted pursuant to rule 404(b) is offered for a non-character purpose and is admitted *in spite of* its potential value as propensity evidence. Evidence admitted pursuant to rule 404(c), by contrast, is admitted precisely *because of* its (usually powerful) value as propensity evidence. *See id.* ¶ 27 (stating that, in the rule 404(c) context, "the accused's propensity is the reason for admission" (quotation simplified)). In conducting a rule 403 balancing with regard to rule 404(b) evidence, the evidence's non-character purpose should be weighed on the "probative value" side of the ledger, while the evidence's value as propensity evidence should be weighed on the "prejudice" side of the ledger. *See State v. Lane*, 2019 UT App 86, ¶ 47 & n.10, 444 P.3d 553 (Harris, J., concurring) ("In conducting an appropriate rule 403 balancing in [the rule 404(b)] context, the 'probative' side of the equation should include only the value of any admissible probability inferences, and should not include the value of any impermissible propensity inferences (which should be assessed on the 'prejudice' side of the equation)."); *see also United States v. Ballou*, 59 F. Supp. 3d 1038, 1069 (D.N.M. 2014) (determining that, "[w]ith all rule 404(b) evidence," courts must undertake a rule 403 analysis under which they "weigh the licit, probative value of the evidence—meaning the value of the rule 404(b)

inference—against the danger of unfair prejudice—which includes the character-propensity inference"). This is not the case with evidence admitted pursuant to rule 404(c)—because such evidence is coming in *because of* (rather than in spite of) its propensity value, that evidence's tendency to prove the defendant's propensity for child molestation can no longer be assessed on the "prejudice" side of the rule 403 balancing test. Indeed, the propensity value of the evidence is precisely what makes rule 404(c) evidence so highly probative. *See Cuttler*, 2015 UT 95, ¶ 27 (stating that, "to give rule 404(c) purpose, evidence of the prior conviction by itself cannot be said to lead to unfair prejudice automatically" and that "the accused's propensity is the reason for admission and no longer constitutes unfair prejudice" (quotation simplified)); *see also Ring*, 2018 UT 19, ¶ 31 (stating that "[r]ule 404(c)'s only function is to admit evidence of prior child sex crimes" and that "evidence of child sex crimes, which rule 404(c) has explicitly deemed admissible," cannot be excluded merely on the basis that its propensity inference is "overly prejudicial").

¶46    Thus, in order for rule 404(c) evidence to be unfairly prejudicial, the defendant must be able to show something *other than* the propensity nature of the evidence that weighs on the prejudice side of the equation. For instance, as our supreme court pointed out in *Cuttler*, a defendant may be able to demonstrate that the proposed evidence contains technicolor details, beyond its tendency to show a propensity for child molestation, that might be unduly prejudicial.[8] *Cuttler*, 2015 UT

---

8. In this case, the trial court determined that "unfair prejudice is not a valid Rule 403 'weighing' argument as to Rule 404(c) propensity evidence." This is incorrect; even the State acknowledges this as an "overread[ing]" of our supreme court's guidance in *Ring* and *Cuttler*. Courts must still analyze rule 404(c) evidence for unfair prejudice pursuant to rule 403, but in the rule 404(c) context the evidence's tendency to show the

(continued…)

95, ¶ 27 (stating that "inflammatory details beyond what is necessary or appropriate for [the jury] to consider when drawing [a] propensity inference" may be unfairly prejudicial, and noting that "the court can prevent this danger of unfair prejudice by limiting the details admitted about" the previous instance of child molestation). Or, even aside from prejudice, a defendant may be able to demonstrate that the proposed evidence fails the rule 403 balancing test because it is cumulative, confuses the issues, wastes time, or causes undue delay. Utah R. Evid. 403. But a defendant who argues that rule 404(c) evidence should be excluded under rule 403 merely because it tends to show his propensity to commit child molestation will not have shown enough to obtain exclusion of the evidence. *See Ring*, 2018 UT 19, ¶ 31 ("The evidence's nature as a prior act of child molestation is not a factor that weighs against admissibility." (quotation simplified)).

¶47 In order to assess its relevance, probative value, and potential for unfair prejudice, we must describe the Electronic Evidence at issue in this case in at least some detail. In some of the communications, Fredrick described becoming aroused, and even ejaculating, while showering with and washing his own children years ago when they were small. In others, Fredrick described becoming aroused while changing his niece's diaper and helping his small nephew use the bathroom. And Fredrick also described arousal on various occasions when "the little girl [he] babysit[s]" or one of his "nieces" was sitting on his lap while reading a story or watching cartoons, including a description of one incident, while watching "SpongeBob," when he was tickling one such girl near her panties.

¶48 Fredrick asserts that this evidence is not relevant, and is therefore inadmissible under rule 402, because it has no

_____

(…continued)
defendant's propensity for committing acts of child molestation should not be considered unfairly prejudicial.

relevance other than to show his propensity to commit acts of child molestation. While this sort of analysis may be appropriate in assessing the admissibility of rule 404(b) evidence, it misses the mark when applied to rule 404(c) evidence. As noted above, in this context, the evidence is being admitted *because of* (and not in spite of) its value as propensity evidence, and such evidence often has powerful probative value. It is precisely because of its tendency to demonstrate Fredrick's propensity for sexually abusing children that the evidence is relevant here. The evidence easily clears the low bar posed by rule 402.

¶49 And with regard to rule 403's balancing test, Fredrick does not identify anything other than the Electronic Evidence's tendency to show propensity that might be unfairly prejudicial. He argues simply that "it is difficult to conceive of evidence more likely to evoke . . . strong emotional reactions [in jurors] than statements describing the sexual abuse of children." As set forth above, this is insufficient. Fredrick must point to something *other than* the propensity nature of the evidence that he deems unfairly prejudicial. And he points to nothing else. He does not argue that the evidence is cumulative or a waste of time. And he does not argue here—and did not argue below—that the Electronic Evidence could have been admitted in a more sanitized fashion, somehow allowing the jury to learn of the previous incidents without unnecessary contextual details.

¶50 Under these circumstances, the trial court did not abuse its discretion in admitting the seven items of Electronic Evidence that were actually used at trial, and we reject Fredrick's claims to the contrary.

CONCLUSION

¶51 Fredrick has not persuaded us that the trial court erred by allowing the CJC Interview to be presented to the jury. His first argument along those lines is unpreserved, and Fredrick does not argue that an exception to preservation applies. And his

second argument fails because he did not include a record of the trial court's ruling for our review. We also conclude that the trial court did not err in denying Fredrick's motion to suppress his interview with police; based on the totality of the circumstances, he was not in custody at the time of the interview and therefore not entitled to a *Miranda* warning. Finally, we reject Fredrick's argument that the trial court exceeded its discretion by admitting portions of the Electronic Evidence under rule 404(c) of the Utah Rules of Evidence.

¶52 Affirmed.

———————

MORTENSEN, Judge (concurring):

¶53 I fully concur in the judgment and analysis of the majority opinion. I write separately to emphasize that the prejudice analysis under rule 403—when associated with rule 404(c)—focuses on prejudice other than the fact that the evidence shows propensity to engage in reprehensible behavior involving children. Admittedly, Utah's appellate case law has muddied this issue. Before the well-worn *Shickles*-factors mandate died a death of a thousand cuts, *see State v Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, ¶ 39, 391 P.3d 1016; (holding that not all *Shickles* factors need be considered); *State v. Cuttler*, 2015 UT 95, ¶ 20, 367 P.3d 981 (holding that it is inappropriate for a trial court to "ever consider" whether evidence will lead to "overmastering hostility"—one of the *Shickles* factors); *Thornton*, 2017 UT 9, ¶ 53 (repudiating prior requirement of "scrupulous examination" of *Shickles* factors); *State v. Lowther*, 2017 UT 34, ¶ 45, 398 P.3d 1032 (holding that a "mechanical application" of the *Shickles* factors is error); *State v. Beverly*, 2018 UT 60, ¶¶ 63–72, 435 P.3d 160 (conducting a rule 404(b) review without mentioning *Shickles* at all), this court stated that the *Shickles* factors—developed specifically to guard *against* improper consideration of propensity evidence—applied to rule 404(c)—a rule adopted specifically *in favor* of consideration of propensity evidence. *See State v. Lintzen*, 2015 UT App 68, ¶ 15, 347 P.3d 433; *State v.*

*Ferguson*, 2011 UT App 77, ¶ 15 n.4, 250 P.3d 89. To the extent these cases hold or infer that the *Shickles* factors applied to rule 404(c), I believe these cases were wrongly decided and their continued viability is highly questionable given development of the law in the intervening years. And regrettably, the advisory committee note still states: "Before evidence may be admitted under Rule 404(c), the trial court should [among other things] . . . consider the factors applicable as set forth in *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988)." Utah R. Evid. 404 advisory committee note. That is simply not presently the law. I would hope our trial courts would ignore this misdirection.

_____