2007 UT App 119

**STATE of Utah, Plaintiff and Appellee,**

v.

**Riley Allen DORAN, Defendant and Appellant.**

**No. 20060278–CA.**

Court of Appeals of Utah.

April 12, 2007.

Randall W. Richards, Richards Caine & Allen, Ogden, for Appellant.

Mark L. Shurtleff, atty. gen., and Jeanne B. Inouye, asst. atty. gen., Salt Lake City, for Appellee.

Before BENCH, P.J., McHUGH and THORNE, JJ.

## OPINION

BENCH, Presiding Judge:

¶ 1 Defendant Riley Allen Doran appeals from his convictions of aggravated sexual abuse of a child, *see* Utah Code Ann. § 76–5–404.1 (2003), sodomy on a child, *see* Utah Code Ann. § 76–5–403.1 (2003), both first degree felonies, and dealing in material harmful to a minor, *see* Utah Code Ann. § 76–10–1206 (Supp.2006), a third degree felony. Before trial, Defendant sought to have his confession excluded on Fifth Amendment grounds. Defendant gave his confession while voluntarily in a police station after being assured by the unarmed interviewing officer that Defendant would be allowed to leave regardless of what he said. The confession at issue did not result from custodial interrogation, and therefore, the interviewing officer's failure to apprise Defendant of his *Miranda* rights prior to the interview did not render the confession inadmissible. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We affirm.

## BACKGROUND

¶ 2 T.R. (the Victim), a thirteen-year-old girl, befriended Defendant and his girlfriend (Wakefield) when the Victim's mother met the couple through Alcoholics Anonymous. The Victim sometimes helped the couple with childcare for their twin infants. In July 2004, Wakefield attended a dance, leaving

Defendant and the Victim home with the infants. After Wakefield left, Defendant put a pornographic movie in the video player and sat down next to the Victim to watch it. While watching the video, Defendant and the Victim began to kiss, and eventually Defendant placed his hand under the Victim's panties and inserted his finger into her vagina. Defendant also exposed his penis and asked the Victim to touch it, which she did. When Wakefield returned later that evening, neither Defendant nor the Victim told her what had transpired.

¶ 3 The next day Wakefield went out again, leaving Defendant and the Victim home with the infants. Defendant and the Victim engaged in the same sexual activity as the day before, but this time Defendant performed oral sex on the Victim. The following day, when Wakefield took the infants to a doctor appointment, Defendant and the Victim again engaged in similar sex acts.

¶ 4 A few days after the incidents, the Victim told Wakefield what had happened and Wakefield called the police. The Victim repeated her story to the officers who initially responded and subsequently to officers at the Children's Justice Center. Several months later, in December 2004, a police detective (the Detective) attempted to contact Defendant at Wakefield's home, which was Defendant's last known address. Although Defendant no longer lived with Wakefield, she told the Detective that she would try to contact Defendant. Later that day, Wakefield phoned the Detective and told him that Defendant was on his way to the police station. The Detective told Wakefield to inform Defendant that if he came in willingly, the Detective would "just get his side of the story, then let him go."

¶ 5 Defendant thereafter arrived at the police station with some friends, including Wakefield. While still in the lobby, the Detective told the group that Defendant would be back in under an hour and took Defendant to an interview room upstairs. To access the interview room, the pair had to pass by several police officers' desks and down multiple hallways. However, no locking doors separated the interview room from the station's main entrance. The Detective was wearing street clothes and his badge, but not his sidearm. Before beginning the interview, the Detective told Defendant that "he was free to leave at any time and that no matter what happened or what was said [during the interview], that [Defendant] would leave the building." The Detective informed Defendant that the Victim had filed a report claiming that she and Defendant had engaged in sexual activity, and asked Defendant if he was willing to tell his side of the story. The Detective made no promises or threats during Defendant's statement and asked questions only to clarify what Defendant was saying.

¶ 6 Defendant's telling of the incidents did not materially vary from the Victim's version, though Defendant painted the Victim as the aggressor or instigator. Defendant denied having sexual intercourse with the Victim and agreed to return the next day to take a voice stress analyzing test. The interview lasted about forty-five minutes, after which Defendant was allowed to leave the police station.

¶ 7 Prior to Defendant's return the next day, the Detective learned that Defendant was homeless and decided that, given Defendant's living situation, he could not allow Defendant to leave after the voice test. When Defendant arrived for his test, the Detective read Defendant his *Miranda* rights before asking any questions or attempting to administer the test. Defendant requested an attorney, and the Detective arrested Defendant without asking further questions.

¶ 8 At a suppression hearing, Defendant sought to have his pre-arrest confession excluded from the trial on the grounds that it was given as a result of custodial interrogation and without Fifth Amendment protections. Defendant testified that he did not feel free to leave and believed he would be allowed to leave only if he told the police what they wanted to hear. The trial court ruled that Defendant was not in custody when he gave his confession and denied the motion to suppress. Defendant now appeals.

**1142**

## ISSUE AND STANDARD OF REVIEW

¶9 Defendant's sole issue on appeal is whether the trial court correctly determined that he was not in custody when he confessed to engaging in sexual conduct with the Victim. The Utah Supreme Court has mandated that appellate courts review custodial interrogation determinations for correctness, giving no deference to the trial court's decision. *See State v. Levin*, 2006 UT 50, ¶¶ 42–43, 144 P.3d 1096.

## ANALYSIS

¶10 Defendant claims that he was in police custody when he confessed and that the police violated his Fifth Amendment rights by not Mirandizing him prior to the confession. To protect a person's Fifth Amendment right to avoid self incrimination, police must give pre-interrogation warnings to persons in custody. *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Persons are in custody when they have actually been arrested or when their freedom of action is restricted to a "degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quotations and citation omitted). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quotations and citation omitted). The Utah Supreme Court has enumerated four factors, listed in *Salt Lake City v. Carner*, 664 P.2d 1168 (Utah 1983), as being valid aids in determining whether a person is in custody: "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *Id.* at 1171; *see also Levin*, 2006 UT 50 at ¶ 36, 144 P.3d 1096.

¶11 United States Supreme Court case law supports the utility of the *Carner* factors in deciding the issue of custody. Two of these cases are factually similar to the instant case: *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam), and *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). In *Mathiason*, the Court held that the defendant was not in custody even though he was interviewed at a police station for thirty minutes about a burglary in which the interviewing officer stated his belief that the defendant was involved. *See Mathiason*, 429 U.S. at 492–96, 97 S.Ct. 711. In holding that there was no custodial interrogation, the Court noted the defendant's voluntary appearance at the station, the relatively short length of time he was interviewed, the fact that the defendant was told he was not under arrest and free to leave, and that the defendant was actually allowed to leave after the interview. *See id.* at 495, 97 S.Ct. 711. Under those circumstances, the Court held that the defendant "was not in custody or otherwise deprived of his freedom of action in any significant way." *Id.; see also California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

¶12 In *Alvarado*, the Supreme Court did not disrupt a state court's determination that the defendant was not in custody when he confessed, despite circumstances which the Court said could distinguish the case from *Mathiason*: the defendant was interviewed for two hours; the defendant was driven to the station by his legal guardians, putting into question the voluntariness of his appearance; and the interviewer did not inform the defendant that he was free to leave. *See Alvarado*, 541 U.S. at 665, 124 S.Ct. 2140. These circumstances raised a legitimate question in the Court's mind regarding the custody issue even though it ultimately upheld the state court's determination.[1] *See id.* at 665–66, 124 S.Ct. 2140.

¶13 The Supreme Court's decisions in *Mathiason* and *Alvarado* demonstrate that the *Carner* factors must be considered to-

---

1. The *Alvarado* Court reviewed the state court's decision under a more deferential standard of review than we use in the present case, and the Court's concerns with the state court's decision were insufficient to reverse the decision as unreasonable. *See Yarborough v. Alvarado*, 541 U.S. 652, 665–66, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

gether contextually, on a case by case basis. *See Carner,* 664 P.2d at 1171. An interrogation at a police station, a site obviously weighing in favor of a finding that the defendant was in police custody, can be balanced by the lack of indicia of a formal arrest. *See Mathiason,* 429 U.S. at 493, 97 S.Ct. 711. Even when the questioning focuses on the defendant, assurances by officers that the defendant is not under arrest and free to leave can tip the scales in favor of finding non-custodial interrogation. *See id.* The circumstances need to be viewed as a whole in determining whether the defendant's freedom of action is restricted to a "degree associated with formal arrest." *McCarty,* 468 U.S. at 440, 104 S.Ct. 3138 (quotations and citation omitted).

¶ 14 Here, the circumstances closely mirror those in *Mathiason* without presenting any of the *Alvarado* concerns. The Detective assured Defendant and his friends that Defendant would not be arrested and was free to leave. The interview itself lasted between thirty and forty-five minutes, similar to the *Mathiason* interview. Though the interview took place in a police station, Defendant appeared there of his own accord and was not escorted by legal guardians as in *Alvarado.* There is no indication that physical obstacles such as locks or armed officers prevented Defendant from leaving at any-time he so chose. Even though the Detective informed Defendant of the Victim's statements, thereby focusing the investigation on Defendant, the Detective comported himself in much the same way as the officer in *Mathiason,* making no accusations or threats of arrest. Defendant was not arrested, nor was his freedom restricted to the "degree associated with formal arrest."

*McCarty,* 468 U.S. at 440, 104 S.Ct. 3138 (quotations and citation omitted). In fact, Defendant left the police station after being interviewed. It was therefore not necessary for the Detective to Mirandize Defendant before conducting the interview.

## CONCLUSION

¶ 15 Defendant voluntarily entered the police station to relate his version of the incidents to the police. The Detective informed Defendant multiple times that he was not under arrest and would not be arrested no matter what he said. The interview, though conducted in a police station, took place in an unlocked room, and there were no guards or locked doors between Defendant and the main exit. After the relatively short interview, during which the Detective asked only a few clarifying questions, Defendant was allowed to leave the police station as promised. Given these circumstances, we hold that the trial court correctly decided that Defendant was not in police custody when he made the incriminating statements in question and that the trial court properly admitted those statements at trial.

¶ 16 For the foregoing reasons, we affirm.

¶ 17 WE CONCUR: CAROLYN B. McHUGH and WILLIAM A. THORNE JR., Judges.