**2016 UT App 37**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARK PHILLIP TINGEY,
Appellant.

Opinion
No. 20140557-CA
Filed February 25, 2016

Fourth District Court, American Fork Department
The Honorable Christine S. Johnson
No. 111100508

Dean N. Zabriskie, Stephen R. Allred, Rhome D.
Zabriskie, and Kevin Mark Kemp, Attorneys
for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

SENIOR JUDGE RUSSELL W. BENCH authored this Opinion, in which
JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.[1]

BENCH, Senior Judge:

¶1     Mark Phillip Tingey appeals the trial court's ruling on his motion to suppress statements he made during a police interrogation. We affirm.

---

1. Senior Judge Russell W. Bench sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    In February 2011, Deputy O'Hara of the Utah County Sheriff's Office located an IP address in Utah County that had shared a number of known child pornography files. He learned that the IP address was assigned to a Brigham Young University (BYU) student living in university housing. Deputy O'Hara obtained a search warrant for the apartment and went with six to eight other officers, including officers from the BYU Police Department, to execute the warrant.

¶3    At least two of the BYU officers were in uniform, while the other officers wore plain clothes with police vests. When the officers knocked on the door of the apartment, Tingey's wife answered. The officers entered the apartment and found Tingey asleep in his bedroom. Deputy O'Hara asked Tingey if they "could step into another room to talk." Tingey "pointed" the officers to a second bedroom used as an office/workout room. Sergeant Burr of the BYU Police Department accompanied Deputy O'Hara and Tingey into the second bedroom. Deputy O'Hara placed an ironing board between Tingey and the officers to hold his recording device and laptop. The bedroom door stayed open throughout the interview, and other officers went in and out of the room.

¶4    When Tingey initially claimed to have accidentally downloaded pornography and to have immediately deleted the file-sharing software, the officers informed him that they "wouldn't be here if there was just one video." Sergeant Burr then warned Tingey, "The way to save yourself and face right now is to be absolutely upfront. . . . [Y]ou need to be absolutely honest with [Deputy O'Hara], okay?" Sergeant Burr went on to say, "[W]e have the ability right now to destroy everything that's going on in your life." Immediately following Sergeant Burr's statements, Deputy O'Hara clarified, "I appreciate you being willing to talk to us because, you know, you don't have to."

¶5 The officers continued talking to Tingey for several minutes before an officer came to tell them that Tingey's wife was leaving for work and needed to retrieve some socks from the room. The officer asked Deputy O'Hara, "[D]o you want [Tingey's wife] to come say goodbye?" Deputy O'Hara replied, "That's up to them. I mean, they—it's not like you're under arrest or anything. You can do and say what you want." Tingey then went into the hallway to say goodbye to his wife. Sergeant Burr left the room with Tingey, and Deputy O'Hara went to check on the progress of the officers who were going through Tingey's computer. After Tingey returned to the second bedroom, Deputy O'Hara continued the interview and ultimately obtained a number of incriminating statements from Tingey.

¶6 Tingey was charged with ten counts of sexual exploitation of a minor, a second-degree felony. *See* Utah Code Ann. § 76-5a-3(1)(a) (LexisNexis Supp. 2009). Before trial, Tingey filed a motion to suppress the police interview on the ground that he was subjected to custodial interrogation without a *Miranda* warning. Following an evidentiary hearing, the trial court made detailed findings of fact and conclusions of law in analyzing the four custody factors, *see infra* ¶ 12. The court ultimately determined that Tingey was not in custody at the time of the interview and denied his motion to suppress. At trial, defense counsel obtained a directed verdict on two of the ten counts of sexual exploitation of a minor, and Tingey was ultimately convicted of the remaining eight counts. Tingey now appeals the trial court's denial of his motion to suppress.[2]

---

2. The State asserts that even if the trial court erred in denying Tingey's motion to suppress, the compelling nature of the forensic evidence on Tingey's computer made any error in admitting the interview harmless. Because we conclude that the

(continued…)

ISSUE AND STANDARDS OF REVIEW

¶7     Tingey asserts that the trial court erred in determining that his interrogation was not custodial and in denying his motion to dismiss. Whether an interrogation is custodial is a mixed question of fact and law, which we review nondeferentially for correctness. *State v. Levin* (*Levin II*), 2006 UT 50, ¶¶ 42, 44, 46, 144 P.3d 1096. We review the trial court's underlying factual findings for clear error. *See id.* ¶ 20.

ANALYSIS

¶8     As a threshold matter, we address Tingey's assertion that the trial court clearly erred in finding that Sergeant Burr's threat was "inaudible." He asserts that this erroneous finding led the trial court to disregard the threat as a factor in its analysis of whether he was in custody and that the error calls into doubt the trial court's "entire legal analysis." However, Tingey's argument overstates the importance of this finding.

¶9     The trial court found,

> [Sergeant Burr] . . . advises that "the way to save yourself is to be absolutely up front." At approximately 2:30 on the recording, [Burr] makes somewhat of a threatening statement, indicating that the potential allegations could be destructive to Tingey. Burr cautions [Tingey] that "we have the ability right now to just [inaudible]. But a lot of this can be based upon how cooperative you are."

---

(…continued)
trial court did not err in denying the motion to suppress, we do not consider the State's alternative argument.

(Fourth alteration in original.) Notwithstanding the court's determination that part of the statement was inaudible on the recording, the transcriber was apparently able to hear it, as the transcript records the statement as "we have the ability right now to destroy everything that's going on in your life." Furthermore, Deputy O'Hara testified at the evidentiary hearing that the threat was made as transcribed.

¶10    But even assuming that this evidence of the statement's contents makes the trial court's finding that the statement was inaudible clearly erroneous, the finding did not lead the trial court to disregard the threat in its analysis, as Tingey suggests. Despite finding that the statement was inaudible, the trial court found that Sergeant Burr made a "threatening statement" to Tingey "indicating that the potential allegations could be destructive to Tingey." Thus, the trial court ultimately found that the threat was made, and we employ that factual finding in our analysis of whether Tingey was in custody.

¶11    The Fifth Amendment to the United States Constitution protects criminal defendants against compulsory self-incrimination. U.S. Const. amend. V. "To protect a person's Fifth Amendment right to avoid self incrimination, police must give pre-interrogation warnings to persons in custody." *State v. Doran*, 2007 UT App 119, ¶ 10, 158 P.3d 1140 (citing U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436 (1966)).

¶12    "[A] person is in custody for purposes of Miranda when the person's 'freedom of action is curtailed to a degree associated with formal arrest.'" *State v. Levin* (*Levin III*), 2007 UT App 65, ¶ 12, 156 P.3d 178 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (additional citation and internal quotation marks omitted). Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S.

318, 323 (1994) (per curiam). Our supreme court has identified four factors to examine in making this determination: "(1) the site of interrogation; (2) whether the investigation focused on the accused;[3] (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983).

¶13　The first factor, the site of the interrogation, weighs against a finding of custody. The interrogation took place in Tingey's apartment. Tingey suggested the second bedroom as a place where he could talk with the officers. The door was open, and other officers came and went throughout the interview. Despite Sergeant Burr's threats, Deputy O'Hara reiterated to Tingey that he did not have to talk to the officers. Tingey even left the room at one point to say goodbye to his wife when she left for work. Nevertheless, Tingey emphasizes the fact that his movement was restricted by an ironing board that was placed in front of him to hold Deputy O'Hara's recording device and computer. Tingey asserts that the ironing board essentially acted as a "blockade" to keep him in the room and in his seat.

---

3. To be clear, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury v. California*, 511 U.S. 318, 324 (1994) (per curiam). Thus, "any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*." *Id.* at 326; *see also Levin II*, 2006 UT 50, ¶ 35, 144 P.3d 1096 (citing *Stansbury*, 511 U.S. at 325); *State v. Heywood*, 2015 UT App 191, ¶ 50 n.4, 357 P.3d 565 (citing *Stansbury*, 511 U.S. at 326). Accordingly, we understand the second factor to refer to situations where, as here, officers disclose to the suspect that he or she is the focus of an investigation.

Generally, an interview in a suspect's home does "not amount to custodial interrogation" as long as the suspect's "freedom of movement was not hindered." *State v. Worthington*, 970 P.2d 714, 716 (Utah Ct. App. 1998) (citing *Beckwith v. United States*, 425 U.S. 341, 347 (1976)). Although the ironing board may have limited the movement of those in the room, it appears to have been placed in front of Tingey as a matter of convenience, not for the purpose of keeping him in the room. The fact that the door remained open, that Tingey was told he did not have to talk to the officers, and that he left the room at one point to say goodbye to his wife indicate that he was not confined for purposes of the interrogation but had the freedom to leave or terminate the interrogation at any point.

¶14   The second factor, whether the investigation focused on the accused, weighs in favor of a finding of custody. Although officers may not have initially known who was downloading criminal material at Tingey's address, upon arriving at the home they "quickly conclude[d] that Tingey [was] their suspect," and "[t]he focus on Tingey as the perpetrator was . . . quite clear within the first few minutes of the interview."

¶15   The third factor, whether objective indicia of arrest were present, weighs against a finding of custody. Objective indicia of arrest include "readied handcuffs, locked doors[, and] drawn guns." *Levin III*, 2007 UT App 65, ¶ 15 (citation and internal quotation marks omitted). The record indicates that "[a]pproximately seven to nine officers were involved in the execution of the warrant" and that most of the officers, including the two who conducted the interview, were not in uniform. All of the officers were armed, "but at no point were any of the sidearms drawn." Only two of the officers actually participated in the interview. Tingey was never handcuffed, and the door to the room where he was interviewed was left open throughout the interrogation. Although the presence of so many officers may

have been intimidating, there were ultimately few, if any, objective indicia of arrest.

¶16 The fourth factor, the length and form of the interview, presents a close question but ultimately weighs slightly against a finding of custody. The interview lasted "just over one hour." The officers used "various interview techniques in order to encourage a confession from Tingey," such as Sergeant Burr's threat and the suggestion that the officers "already had built a significant case against him." The officers' questions were accusatory, which "often indicates to the [suspect] that he or she is not free to leave." *Levin II*, 2006 UT 50, ¶ 36, 144 P.3d 1096. Tingey's movement was not restricted, however, and the officers informed Tingey that he was not required to talk to them and reassured him several times that he was not under arrest. In fact, Tingey declined at least one opportunity, before having made any incriminating statements, to terminate the interview. As the trial court observed, Tingey took a break six minutes into the interview to leave the room and say goodbye to his wife, at which point Deputy O'Hara told him, "[I]t's not like you're under arrest or anything. You can do and say what you want." Having left the interview room and been reassured that he was not under arrest and not confined to the room, Tingey was "presented [with] the perfect opportunity . . . to terminate the interview, had he wished to." Although Tingey may have felt that it was in his best interest to continue the interview, a reasonable person in Tingey's circumstances would have understood that he was free to end the interview if he chose to. *See id.* ¶ 35. And indeed, Tingey's trial testimony indicates that this was exactly his perception: he confirmed that the officers told him he could leave but explained that he believed it was important for him to cooperate in order to avoid spending his life in prison.

¶17 Although this case presents a close question on the issue of custody, we ultimately conclude that the above factors weigh

against a finding of custody. Accordingly, the trial court did not err in denying Tingey's motion to suppress.

CONCLUSION

¶18    We conclude that any error in the trial court's finding regarding the audibility of the interview recording did not affect its ultimate findings and conclusions. Furthermore, we conclude that the trial court did not err in determining that Tingey was not in custody at the time of his interrogation and that a *Miranda* warning was therefore not required. Accordingly, we affirm the trial court's denial of Tingey's motion to suppress statements made during the police interview.

─────────