**2025 UT App 121**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STEPHANIE HANSEN,
Appellant.

Opinion
No. 20220178-CA
Filed August 14, 2025

Fourth District Court, Provo Department
The Honorable Christine Johnson
No. 201402201

Jennifer L. Foresta, Attorney for Appellant

Jeffrey S. Gray, Jared Perkins, and
Christopher D. Ballard, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1      Stephanie Hansen was charged with one count of child abuse for slapping and choking her five-year-old daughter. Before trial, Hansen filed a motion to suppress some incriminating statements that she had made to a Division of Child and Family Services (DCFS) caseworker and, later, to a detective, arguing that she had been subjected to a custodial interrogation without first receiving the *Miranda* warnings. The district court denied the motion, and Hansen was later convicted at the close of a jury trial.

¶2      Hansen now appeals, arguing that the district court erred in denying the motion to suppress. For the reasons set forth below, we conclude that Hansen was not subjected to a custodial

interrogation. We accordingly reject Hansen's arguments and affirm her conviction.

## BACKGROUND[1]

### *Allegations and Interviews*

¶3 In May 2020, Hansen bought a kitten for her five-year-old daughter, Iris.[2] On July 8, Iris told Hansen that she had just killed the kitten and that she had done so on purpose. Iris said that "she wanted the cat to die," and she also told Hansen that she wanted Hansen "to die." Hansen was very upset and yelled at Iris, and the two had an argument. That same day, Hansen called both Iris's grandmother (Grandmother) and Iris's father (Father). During those conversations, she told each of them about Iris killing the kitten, and she also told each of them that, during the ensuing argument, she had slapped Iris across the face.

¶4 Two days later, at around 3:30 p.m., a DCFS caseworker (Caseworker) arrived at Hansen's apartment, accompanied by two police officers (Officer 1 and Officer 2).[3] Caseworker was

---

1. As discussed in more detail below, the facts at issue were developed at both an evidentiary hearing and at a subsequent trial. On appeal, Hansen only challenges the denial of her motion to suppress, so we "recite the facts in the light most favorable to the trial court's findings." *State v. Fullerton*, 2018 UT 49, ¶ 4 n.1, 428 P.3d 1052 (quotation simplified).

2. A pseudonym.

3. The events at the apartment were recorded on the bodycams of the officers. Footage from both bodycams was submitted below and is in the appellate record. It includes clear audio and video and is consistent with the district court's findings following the

(continued…)

wearing jeans and a polo shirt, while the two officers were in full uniforms. After Caseworker knocked on the door, Hansen opened the door and let Caseworker and the two officers inside.

¶5    As the men were entering, Hansen said, "I'm really nervous." When Officer 2 went to close the door, Hansen asked him to keep it open, and he complied. Hansen said to the group that she had received a "threatening phone call" telling her that she would "receive people here." Iris was in the front room at the time, and Caseworker turned to her and asked her to go to her room so that he could speak to her mom privately. Hansen then suggested that she could speak with Caseworker and the officers outside with the door shut, thus leaving Iris inside. In response, Officer 2 offered to stay inside with Iris while Hansen, Caseworker, and Officer 1 went outside. At that point, Caseworker and Officer 1 walked outside. Hansen started to follow them, but when she reached the open doorway, she hesitated and stopped, saying, "No, I'm . . . no." Hansen then expressed her discomfort with the idea of going outside while leaving Officer 2 behind, saying that she didn't want Officer 2 to speak to Iris without her. Hansen suggested, again, that they should leave Iris inside while the adults went outside and spoke on the walkway that ran outside her apartment door.

¶6    The following exchange then took place:

> Officer 2: You don't have a choice right now. You need to go outside and talk to them. And I have to be with her.

> Officer 1: You gotta come outside and talk to this man right here.

---

suppression hearing. Our account of the events at the apartment (including the verbal exchanges) is drawn from that footage.

Hansen: Well, then—well, I want—

Officer 2: You don't want her to hear the conversation about to happen.

Officer 1: Stephanie, you have to come outside and talk to this man right here, please. Please come outside and talk to him.

Hansen: You're telling me I can't hear what you're going to tell my five-year-old?

Officer 2: I'm not gonna talk to your five-year-old, but I don't want her to hear the conversation you're gonna have with this gentleman and this officer.

Hansen: Well, I understand that.

Officer 2: So, step outside and I'll be right here. And there's a body camera going, okay? Nothing's gonna happen. The door won't be shut, I'll crack it. But I'm gonna stay right here and you're gonna go talk to them. Okay? That's how it has to be.

¶7 After a four-second pause, Officer 1 said, "Please come outside, Stephanie." As he said this, Hansen relented and stepped outside to the walkway. Caseworker and Officer 1 were already there, and Officer 2 remained inside with Iris with the front door slightly cracked open.

¶8 Once outside, Hansen stood against the banister that ran along the walkway. Hansen's apartment was on the second floor, and the walkway overlooked an adjacent parking lot. There was a public stairway at the end of the walkway, and over the course of the ensuing conversation, several people walked up or down the stairs. There was a busy road near the parking lot, and during the recorded conversation, a steady stream of cars passed by.

¶9     Caseworker stood a few feet away from Hansen on her left side, while Officer 1 stood a few feet away on her right side. At the beginning of the conversation, Officer 1 told Hansen to "talk to him" (meaning, Caseworker), so Hansen turned and faced Caseworker. Officer 1 then stayed a few feet behind Hansen during the conversation and did not meaningfully participate in what followed.[4]

¶10     Caseworker started by asking Hansen to tell him about the "threatening phone call" that she had mentioned earlier. Hansen clarified that it had actually been a threatening "text message," not a phone call, that she had received it from Father, and that Father had told her that people were coming to take Iris away from her. Caseworker said, "That's not my goal, okay. I know it looks that way. That's not my goal." Caseworker then told Hansen that he had received a report asserting that Hansen had "hit" Iris. Caseworker asked Hansen if that had happened, and Hansen responded that there had been an "incident" in which she "smack[ed]" Iris "on the cheek." Caseworker asked Hansen to explain more about what had happened, and over the course of several minutes, Hansen recounted the circumstances detailed above—namely, that Iris had killed the kitten, the two had argued about it, and Hansen had "smacked" Iris during that argument. In response to further questioning, Hansen volunteered that she had "hit [Iris] hard on the cheek" with an "open palm" and that she had left "a mark there." Caseworker told Hansen that he had also heard that she had "strangled" Iris and "grabbed her around the neck," but Hansen shook her head and said "no."

---

4. Around three minutes into the conversation on the walkway, Hansen expressed some discomfort about what was going on inside her apartment, which prompted Officer 1 to assure Hansen that Iris was "fine" and that Officer 2's "bodycam [was] rolling." But Officer 1 did not otherwise participate in the discussion between Hansen and Caseworker about the alleged abuse.

¶11    At one point during the conversation, Hansen moved toward the door and repositioned herself. At another point, Hansen opened the front door a little wider and looked in to check on Iris. In those moments, neither Caseworker nor Officer 1 stopped Hansen from moving around. Throughout the conversation, Caseworker remained soft-spoken and polite, and he never raised his voice.

¶12    Around ten minutes into this interview, Grandmother arrived on the walkway, approached Hansen, and asked if she was okay, to which Hansen replied, "We're talking." Officer 1 told Grandmother to wait out of the way and said that she could talk to "them" momentarily.

¶13    About three minutes after that interaction, Caseworker, Hansen, and Officer 1 moved inside so that Caseworker could speak with Iris. When he sat down with her, Caseworker saw a mark on Iris's cheek and a bruise on the back of her neck. Caseworker then spoke with Iris. During that discussion, Iris told Caseworker that Hansen had kicked her after she killed the kitten. After showing Caseworker the bruise on the back of her neck, Iris said, "My mommy just did it." Iris was nonresponsive when Caseworker asked her about the mark on her cheek.

¶14    Officer 1 stepped outside, called the detective who was working on the case (Detective), and asked him to come to the apartment. Detective arrived a short time later, at which point he asked Officer 1 to escort Hansen to the police station. Outside the presence of Iris, Officer 1 said to Hansen, "I'm not arresting you, but I do need to take you to the station so that a detective can talk to you," and he told Hansen that she wouldn't be handcuffed if she was "cooperative." Hansen left Iris with Grandmother, and Officer 1 then drove Hansen to the station in his car.

¶15    Once there, Detective interviewed Hansen.[5] At the beginning of the interview, Detective verbally informed Hansen of her *Miranda* rights. In response to questions from Detective, Hansen indicated that she understood her rights and that she did not have any questions about them. Detective told Hansen that if he asked a question that she didn't "like," she didn't "have to answer that question." Detective asked Hansen to sign a written waiver of her *Miranda* rights, but Hansen refused, expressing concerns about how it might be used by Father and Grandmother. Although she was unwilling to sign the written waiver, Hansen agreed that she was willing to answer some questions.[6]

¶16    During the interview, Hansen repeatedly admitted to slapping Iris. She said, "I smacked her across the face on her cheek and left a mark on her face," and she later said, "I slapped her hard." But when Detective brought up the bruises on Iris's neck, Hansen repeatedly denied choking Iris, at one point asking, "[A]re you trying to coerce me into telling you I did that?" When Detective later asked whether there was "anything that might have been accidental . . . versus choking," Hansen replied, "[M]aybe . . . I don't know." Hansen later suggested, however, that the bruising on Iris's neck might have been caused by Iris falling off a chair or bumping into the ladder on her bunk bed.

*Charge and Motion to Suppress*

¶17    In July 2020, Hansen was charged with one count of child abuse, a class A misdemeanor. In the information, the State alleged that Hansen had "intentionally or knowingly inflict[ed]

_____

5. This interview was recorded, and that recording was later submitted to the district court and is in the appellate record.

6. Hansen has not argued on appeal that her verbal waiver of the *Miranda* rights was invalid because she did not sign the written waiver.

physical injury" on Iris, thus violating Utah Code sections 76-5-109(2) and (3)(a).

¶18 Hansen later filed a motion to suppress the statements that she had made to Caseworker at the apartment, as well as the statements she made to Detective at the police station.[7] Hansen first argued that the statements she made at the apartment should be suppressed because she was subjected to a custodial interrogation without first receiving the *Miranda* warnings. In Hansen's view, she was "in custody," in part, because "the officers specifically told [her] that she had to answer" Caseworker's "questions about the allegations of abuse," and because, on the walkway, the positioning of Officer 1, Caseworker, and the banister "effectively block[ed] her from leaving unless she chose to jump off." Hansen then argued that although she received the *Miranda* warnings once at the police station, the statements she made to Detective should be suppressed because the second interrogation was "so close in time to the first" and her answers naturally flowed from the earlier interrogation. Hansen claimed that Detective had "asked her questions which elicited essentially the same information she provided in response to the questioning" from Caseworker at her apartment. At the close of her motion to suppress, Hansen asked the court to hold an evidentiary hearing.

¶19 In response, the State filed a notice reserving the right to file a written opposition to the motion until after the court held an evidentiary hearing. At the subsequent evidentiary hearing,

---

7. Hansen's motion also asked the court to suppress statements she made to the officers at the apartment. But Hansen has not pointed to anything incriminating that she said to the officers; instead, her arguments have been directed at various things she said to Caseworker (albeit in the presence of Officer 1 while on the landing), and, later, Detective. Regardless, our analysis below would apply with equal force to anything she said to the officers.

Officer 1, Officer 2, Caseworker, and Detective all testified, and the court also received the footage from both officers' bodycams. Through questioning of the officers and playing the bodycam footage, the State showed that, at the apartment, the officers never told Hansen that "she was not free to leave," never drew their weapons, and never physically touched or restrained Hansen.

¶20 The State later filed a written opposition to the motion to suppress. There, the State argued that Hansen was not subjected to a custodial interrogation at the apartment. This was so, according to the State, because the interview occurred at Hansen's apartment, she "was not detained by police," and there were "no objective indicia of arrest," such as "police lights or sirens," "locked doors," or "readied handcuffs." In the State's view, the discussion with Caseworker was entirely "consensual[]." From there, the State argued that Hansen's statements at the police station should not be suppressed. The State reiterated its view that there had not been a *Miranda* violation at the apartment, thus responding to Hansen's main argument about the statements she had made to Detective. The State also argued that there had been a sufficient break between the two interviews, that Hansen had been given the *Miranda* warnings before she answered any questions from Detective, and that she chose to waive those rights.

¶21 At the close of a subsequent hearing, the district court issued a ruling from the bench denying Hansen's motion to suppress. The court first ruled that the interview at the apartment did not constitute a custodial interrogation. In doing so, the court found that although the interview occurred on a "narrow walkway," there "was nothing blocking the door," Hansen "had a clear route back inside her apartment," and Hansen was able to "reach[] out and push[] the door open a bit" at one point when she was "dissatisfied that it was [not] cracked enough." The court also found that neither officer had "flashed a badge, handcuffs, a gun, [or] anything of that nature." And the court expressed its

opinion that there was "no show of authority" or "sign[] of custody."

¶22 The court also stressed that the "idea of talking outside on . . . the balcony walkway area was Ms. Hansen's idea." The court acknowledged that one of the officers subsequently told Hansen that "she didn't have a choice." While the court agreed that, "in a vacuum," that statement "might appear to be problematic," the court concluded that, "in context," the officer was simply saying that Hansen didn't have a choice about where the interview would occur, not that Hansen had no choice about whether it would occur at all.

¶23 The court thus determined that, under these circumstances, "a reasonable person would have felt that he or she was at liberty to leave," and the court further determined that the circumstances of the interview did not present the "inherently coercive pressures" associated with an arrest. For these reasons, the court ruled that Hansen was not "in custody for purposes of *Miranda*" at the apartment and that *Miranda* warnings were not required for that interview. Because there had been no *Miranda* violation at the apartment, the court then ruled that there was no basis for suppressing the statements made during the interview with Detective at the police station.

*Trial and Conviction*

¶24 The case later went to trial. During the State's case, Grandmother and Father each testified that on the day of Hansen's confrontation with Iris, Hansen had called and said that she had hit Iris. Caseworker testified about his interactions with Hansen at the apartment a few days later, including Hansen's admissions that she had "slapped" Iris, as well as his observations of a "slap mark" or a "handprint" on Iris's cheek and a "mark on the back of her neck." The State played the bodycam footage from the officers in which Hansen made incriminating statements. Finally, the State called Detective, who recounted the admissions

that Hansen made during his interview with her later that day, and the State played the audio of that interview for the jury. At the close of trial, the jury convicted Hansen of child abuse.

## ISSUE AND STANDARDS OF REVIEW

¶25    On appeal, Hansen challenges the district court's denial of her motion to suppress. "We review a denial of a motion to suppress as a mixed question of law and fact and will disturb the district court's factual findings only when they are clearly erroneous, but we afford no deference to the district court's application of law to the underlying factual findings." *State v. Goddard*, 2021 UT App 124, ¶ 10, 501 P.3d 1188 (quotation simplified). The question of whether there was a "custodial interrogation for *Miranda* purposes" is a question of law that is reviewed "for correctness." *State v. Fullerton*, 2018 UT 49, ¶ 12, 428 P.3d 1052.

## ANALYSIS

¶26    As she did below, Hansen argues that she was subjected to a custodial interrogation at the apartment and that, as a result, the statements she made at the apartment and in the subsequent interview at the police station should be suppressed. We disagree.

¶27    Officers are not required to give the *Miranda* warnings "every time [they] ask someone questions." *State v. Jessop*, 2023 UT App 140, ¶ 38, 540 P.3d 713, *cert. denied*, 550 P.3d 998 (Utah 2024). Instead, the "*Miranda* warnings must be given to a defendant subject to custodial interrogation." *Id.* (quotation simplified). For *Miranda* purposes, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).

¶28    The question of whether a person was in "custody" for *Miranda* purposes is "analyzed using a two-step analysis." *Jessop*, 2023 UT App 140, ¶ 40. The "initial step" asks the court to "ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (quotation simplified); *see also State v. Fredrick*, 2019 UT App 152, ¶ 30, 450 P.3d 1154 (recognizing that the question of "whether a reasonable person would have felt free to leave" is "an objective one"). To determine "how a suspect would have gauged his freedom of movement," courts examine "all of the circumstances surrounding the interrogation. Relevant factors include, but are not limited to, the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Jessop*, 2023 UT App 140, ¶ 41 (quotation simplified).

¶29    If the court concludes "that an individual's freedom of movement was not curtailed, then the person was not in custody for *Miranda* purposes and the court's analysis ends there." *Id.* ¶ 40. Conversely, if the court concludes that the individual's freedom of movement was curtailed, the court moves to the second step, which asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *State v. Fullerton*, 2018 UT 49, ¶ 21, 428 P.3d 1052 (quotation simplified). Put slightly differently, the question at the second step is whether "there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *State v. Goddard*, 2021 UT App 124, ¶ 44, 501 P.3d 1188 (quotation simplified).[8]

---

8. It may seem a touch counterintuitive (particularly to a layperson) to suggest that a suspect might not be in "custody"

(continued…)

¶30    In describing the kind of environment that would present the "same inherently coercive pressures as the type of station house questioning at issue in *Miranda*," *Fullerton*, 2018 UT 49, ¶ 21 (quotation simplified), we've noted that a station house interrogation "frequently is prolonged" and is one "in which the detainee often is aware that questioning will continue until" the detainee provides the "interrogators the answers they seek, and in which the subject feels completely at the mercy of the police," *State v. MacDonald*, 2017 UT App 124, ¶ 24, 402 P.3d 91 (quotation simplified). The United States Supreme Court has held that "the paradigmatic *Miranda* situation" is one in which "a person is arrested in his home or on the street and whisked to a police station for questioning," such that the "detention represents a sharp and ominous change" in which "the shock may give rise to coercive pressures." *Howes*, 565 U.S. at 511.

¶31    One of the hallmarks of such an environment is isolation from the public. As explained by the Supreme Court, "exposure to public view both reduces the ability" of an officer "to use illegitimate means to elicit self-incriminating statements and diminishes [a suspect's] fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). Indeed, the Supreme Court's decision in *Miranda* itself is illustrative of this. There, the Court considered the consolidated appeals of four defendants who each raised the same issue (albeit

_____

even though the suspect's movement has been restrained. But the cases clearly draw this distinction. According to the United States Supreme Court, the "freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). When illustrating this distinction, we've noted that "a driver is not free to leave during a traffic stop, nor a pedestrian during a *Terry* stop. But these temporary and relatively nonthreatening detentions do not constitute *Miranda* custody." *State v. MacDonald*, 2017 UT App 124, ¶ 24, 402 P.3d 91 (quotation simplified).

on individual facts). *See Miranda v. Arizona*, 384 U.S. 436, 436, 491–99 (1966). In concluding that all four suspects had been subjected to custodial interrogations, the Court noted each of the interrogations "share[d] salient features—incommunicado interrogation of individuals in a police-dominated atmosphere," where the individual in question was "cut off from the outside world," "thrust into an unfamiliar atmosphere," and "run through menacing police interrogation procedures." *Id.* at 445, 457.

¶32 In addition to considering the location, courts also consider any other circumstances that are relevant to the degree of coercive pressure. In *Goddard*, for example, we held that an interrogation did not present sufficiently coercive pressure where there was "no suggestion that the officers brandished firearms, threatened [the defendant], or employed any kind of physical force," and where the defendant "was not handcuffed, physically restrained, or even placed in the back of a police vehicle for questioning." 2021 UT App 124, ¶ 51. And this was so even taking into account "the aura of authority surrounding" the "armed, uniformed officer" and "the knowledge that the officer [had] some discretion in deciding" the outcome of the interaction. *Id.* (quotation simplified).

¶33 With this as the legal backdrop, we turn to the question of whether Hansen was subjected to a custodial interrogation at the apartment. Again, the first step asks whether, "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (quotation simplified). The district court concluded that in these circumstances, a reasonable person would have felt free to terminate the interrogation and leave, but we disagree.

¶34 The court placed great emphasis on the fact that it was initially Hansen's idea to go out to the walkway. And this is true. But that suggestion from Hansen has to be placed in context.

Hansen told Caseworker that she had just received a "threatening phone call" (which she later clarified was a text) from Father telling her that people were coming to take Iris away from her. And then, sure enough, a DCFS caseworker arrived at her door with two armed officers in tow. Thus, from the outset, this wasn't a "nonthreatening" encounter, *MacDonald*, 2017 UT App 124, ¶ 24 (quotation simplified), nor was it an encounter or interview that Hansen had in any way volunteered for or initiated. Instead, Hansen made the suggestion to go to the walkway only after Caseworker and two officers had entered her apartment and indicated that they were going to talk to her about what had happened with Iris.

¶35 At that point, Hansen did suggest that the conversation could happen outside. But after she made that suggestion, Hansen resisted when Officer 2 responded that Iris would be left alone inside with him while the conversation occurred. When Hansen reached the open doorway, she hesitated and actually stopped, saying, "No, I'm . . . no." After she said that, the two officers made several statements to Hansen that clearly communicated to her that she didn't have a choice. In fact, Officer 2 said this to her directly and in exactly those terms, telling Hansen, "*You don't have a choice right now*. You need to go outside and talk to them. And I have to be with her." (Emphasis added.) A few moments later, Officer 2 used yet more command-form language, telling Hansen, "I'm gonna stay right here and *you're gonna go talk to them*. Okay? *That's how it has to be*." (Emphases added.) For his part, Officer 1 told Hansen, "You gotta come outside and talk to this man right here," and, "[Y]ou have to come outside and talk to this man right here, please."

¶36 It's difficult to imagine language from police officers that could more clearly communicate to a suspect that the suspect has no choice but to talk than language such as "you don't have a choice right now," "you're gonna go talk to them," and "you have to come outside and talk to this man." Yet despite these

commands, the district court drew a distinction, suggesting that these statements were only about *how* or *where* the interview would take place, not about *whether* it would take place. But in our view, this distinction is at odds with what the officers said and with the practical realities of the situation. The officers didn't qualify their commands, saying anything along the lines of, "As long as you're still willing to talk to us, we need that conversation to be outside the presence of your daughter." Rather, without any such qualification, the officers told Hansen that she had to go outside and talk to Caseworker. In terms of the practical realities, we don't believe that a reasonable person who was given a direct command from a uniformed police officer would feel free to parse that command out, reinterpret its semantics, and choose to disregard it, nor do we believe that law enforcement officers would typically look favorably upon such an attempt by a person who had received such a command.

¶37    Along these same lines, we note that in many *Miranda* cases, it mattered a lot if officers affirmatively told a suspect that the suspect was free to leave. In *Howes*, for example, officers interviewed a suspect who was already incarcerated on an unconnected offense. 565 U.S. at 502. On appeal, the Supreme Court concluded that the suspect was not in custody for *Miranda* purposes during this interview. In doing so, the Court stressed that one of the "[m]ost important" factors was that the suspect "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." *Id.* at 515. For similar reasons, many Utah decisions have held that a suspect was not in custody, in part, because officers told the suspect that he or she was free to leave. *See, e.g.*, *Fullerton*, 2018 UT 49, ¶¶ 30, 32 (concluding that the defendant was not in custody where he "was assured at least three times that he was not under arrest and was free to leave—and each time he acknowledged the assurance and indicated understanding"); *State v. Fuller*, 2014 UT 29, ¶ 48, 332 P.3d 937 (concluding that a defendant was not in custody where he "was

specifically told that he was free to leave at any time"); *State v. Tingey*, 2016 UT App 37, ¶¶ 5, 16, 368 P.3d 467 (concluding that the defendant was not in custody where he "confirmed that the officers told him he could leave," and where an officer told him that "It's not like [he was] under arrest or anything" and that he could "do and say what [he] want[ed]"). Here, if officers had meant to tell Hansen that they were only directing her where the conversation would occur (as opposed to whether it would occur), they could have said so, but they didn't. And beyond that, the officers never told Hansen that she did not have to speak with them or Caseworker and that she was free to terminate the encounter whenever she wanted.

¶38 Finally, we note that there were other circumstances in those initial moments that were indicative of this not being a voluntary encounter. Hansen knew that she was suspected of wrongdoing relating to her child, and she told the officers and Caseworker that she was "really nervous" as soon as they entered her apartment. In addition, Hansen was outnumbered three to one, with two of the people who entered her apartment being armed police officers. These circumstances would have contributed in some measure to a reasonable person's perception that this encounter was not voluntary.

¶39 In the context of this case, however, we ultimately believe that the direct and command-form language used by the officers was the most important factor, because that language would have communicated to a reasonable person that the person was not free to leave and terminate this encounter. As a result, we conclude that Hansen's freedom of movement had been curtailed before she began speaking with Caseworker on the walkway.

¶40 We accordingly turn to the second step of the analysis, under which we consider whether the interview with Caseworker on the walkway presented "the same inherently coercive pressures as the type of station house questioning at issue in

*Miranda.*" *Fullerton*, 2018 UT 49, ¶ 21 (quotation simplified). Here, we agree with the district court and the State that the circumstances surrounding this interview did not present such pressures.

¶41    As discussed above, one of the key components of this part of the analysis is whether the suspect was isolated or rendered incommunicado in a police-dominated atmosphere. Hansen was not. This interview took place in the middle of the day on an open-air, public walkway. Hansen stood next to a banister for some of it, there was a parking lot on the other side of the banister, there were stairs at the end of the walkway, and there was a busy road a short distance away with cars driving by throughout the discussion. Members of the public walked up and down those stairs a few times during the interview. About ten minutes into the interview, Grandmother arrived on the scene, approached the group, interrupted the interview, and asked Hansen if she was okay. This is a far cry from what would be expected in an ordinary station house interrogation, where members of the public are not walking or driving by and where a family member would certainly not be allowed to simply walk onto the scene and observe the events, much less interrupt the interview.

¶42    Beyond this, other circumstances also support the conclusion that Hansen was not subjected to the kinds of coercive pressures involved in a station house interrogation. There was only one officer present during this portion of the interview, and he remained behind Hansen during her conversation with Caseworker. This officer never made any physical contact with Hansen, never attempted to restrain her in any way, never drew his weapon, and never made any show of force. Indeed, after Hansen came out to the walkway, the officer was largely silent.

¶43    The questioning on the walkway instead came from Caseworker. But Caseworker was not a police officer, much less a uniformed officer, and he was clad in jeans and a polo shirt.

Caseworker was soft-spoken throughout the interview and never raised his voice. Caseworker made no threats to Hansen—indeed, he assured her at the beginning of their conversation that it was "not [his] goal" to take Iris away from her.

¶44    In addition, while we don't believe that Hansen could reasonably leave, we note that she was able to exercise at least some control over her surroundings. Hansen opened the front door further at one point, ostensibly to keep Iris within view, and she did this on her own without interference. This, too, is unlike the kind of thing that would typically occur in a station house interrogation. Finally, we note that while custodial interrogations in other *Miranda* cases have often been lengthy, this one lasted around thirteen minutes.

¶45    Viewing all these circumstances together, we conclude that while Hansen's movement was curtailed, she was not subjected to the kinds of pressures ordinarily associated with an arrest or a station house interrogation. For these reasons, we conclude that the officers were not required to give Hansen the *Miranda* warnings before she spoke with Caseworker, and there was accordingly no basis to suppress the statements she made at the apartment. Because Hansen's arguments relating to the interview with Detective hinge on her assertion that a violation occurred at the apartment, we likewise see no basis for concluding that those statements should have been suppressed either.

CONCLUSION

¶46    We conclude that Hansen was not in custody for *Miranda* purposes during her interview at the apartment. As a result, we affirm the district court's denial of her motion to suppress, and we likewise affirm her conviction.

————————